**UNITED STATES of America**

**v.**

**Peter MORAITES et al.**

**Appeal of John PENSEC, Appellant.**

**No. 71–1495.**

United States Court of Appeals,
Third Circuit.

Argued Oct. 7, 1971.

Decided Feb. 9, 1972.

Stephen N. Dermer, Lowenstein, Sandler, Brochin, Kohl & Fisher, Newark, N. J. (Matthew P. Boylan, Newark, N. J., on the brief) for appellant John Pensec.

John W. Bissell, Asst. U. S. Atty., Newark, N. J. (Herbert J. Stern, U. S. Atty., Newark, N. J., William Braniff, Asst. U. S. Atty., on the brief), for appellee.

Before KALODNER, STALEY and ADAMS, Circuit Judges.

## OPINION OF THE COURT

STALEY, Circuit Judge.

Appellant, John Pensec, was convicted following a jury trial of conspiracy to misapply bank funds in violation of 18 U.S.C. § 371. In addition, appellant was convicted of three substantive charges of misapplication of bank funds in violation of 18 U.S.C. §§ 656 and 2 and was acquitted of two counts charging him with accepting fees for procuring bank loans.

Appellant had been indicted with several other individuals and a number of corporations in a 61-count indictment. The Government then elected to sever its case against the corporations and three of the individuals and proceed to trial against appellant and one Peter Moraites. Moraites later pleaded guilty to two counts charging violation of 18 U.S.C. § 215 and was also severed. Appellant Pensec was then tried on a restructured indictment, all but six counts having been dismissed.

At all times relevant to the indictment, appellant had been chief operating officer of Midland Bank, Paramus, New Jersey ("Midland"). The Government alleged that appellant Pensec, together with Moraites, a member of Midland's board of directors, involved Midland Bank for the first time in a specialized type of lending, that of loans to the ocean shipping industry. The Government admits that these ship loans had the initial approval of Midland's board of directors, with certain specified limitations regarding types of collateral and dollar amounts. The Government's theory is that these loans began to fail and because of insufficient collateral, Midland faced large losses. The Government contends that Pensec and Moraites, in an effort to avoid these losses, poured more and more of Midland's cash funds into unsecured and uncollateralized loans. This cash was used to keep the various ships in operation until the loans could be repaid.

## I. THE EVIDENCE

The following is a capsulized version of the evidence. The Government is, by virtue of the jury's verdict, entitled to have this evidence viewed in the light most favorable to the prosecution. United States v. De Cavalcante, 440 F.2d 1264 (C.A.3, 1971).

Appellant became chief operating officer of the Midland Bank in late 1964. From 1964 until 1968, he was a member of Midland's board of directors as well as a member of the board's executive committee. Commencing in 1965, Director Moraites presented to Midland's board of directors a program for ship loans which he urged Midland to undertake.[1] At the outset, each loan was presented either to the board or to the ex-

---

1. Three types of ship loans were proposed. (1) Mortgage loans secured by a mortgage on the hull of the borrowing vessel; (2) Loans secured by an interest on a particular cargo being shipped; and (3) Letters of Credit. As presented to the board by Moraites, mortgage loans would be secured only by a first preferred ship mortgage, and Midland would never be in a secondary, subordinate position. With regard to cargo loans, Moraites asserted that cargo could not be off-loaded until Midland was paid. Moraites told the board that letters of credit would be granted only against the deposit of cash collateral in the Midland Bank specifically earmarked to secure that letter of credit.

ecutive committee for approval. Beginning in early 1966, the board established dollar limitations for the total amount of ship loans that it would permit to be outstanding. The board delegated its authority with regard to ship loans to Moraites and Pensec, but the loans were to be kept within the monetary limitations and collateral requirements set by the board. Moraites, a maritime attorney practicing in New York, was relied upon by the board to provide the necessary expertise and documentation for Midland's portfolio of ship loans. Pensec was given sole authority to accept ship loans for Midland and was the sole bank officer with responsibility for supervision of the ship loans. Due to the specialized nature of this type of lending, Moraites, by virtue of his expertise and Pensec, by virtue of his delegated authority, had virtually absolute control[2] of Midland's ship loan portfolio.

By mid-1966 the ship loans of one George T. Bacalakis were in difficulty. These loans had been procured by Moraites who had an interest in the borrowing ships. In October of 1966, Moraites began urging one John T. W. McTaggert to take over the operation of the Bacalakis vessels, McTaggert, together with one John P. Katsoulakos, owned a ship brokerage firm, K&M Shipbrokers, Ltd. ("K&M"). This company was in the business of operating and managing vessels on behalf of ship owners, although some of the ships were owned by Katsoulakos.

McTaggert testified that as the result of Moraites' continued entreaties, he and Katsoulakos went to New York to consider Moraites' proposal. As Moraites presented it, he had a personal interest in the ships that had been financed for Bacalakis and was asking K&M to take them over and run them for the benefit of the owners and financiers. Moraites said that the Israel Discount Bank was about to foreclose its mortgages on these vessels and that Midland's outstanding debt, which was unsecured and without any collateral, amounted to $375,000. McTaggert testified that K&M agreed to attempt to salvage the operation of the vessels. K&M agreed to give second mortgages to secure the previously unsecured $375,000.

K&M determined that they would require $150,000 in working capital to undertake the project. Moraites told McTaggert that "he had taken care to see that the $150,000 was forthcoming and he would make arrangements with Mr. Pensec." The $150,000 was generated by a letter of credit in that amount from Midland Bank. No collateral was deposited with Midland to secure the letter of credit.

K&M then took over the operation of the Bacalakis vessels. It soon became apparent that the initial $150,000 advancement of working capital was insufficient. When McTaggert informed Moraites of this fact, Moraites replied that he, Moraites, had arranged with Pensec that Midland Bank would provide K&M with whatever funds were necessary to keep the Bacalakis ships operating.[3]

McTaggert described the manner in which additional monies over and above

---

2. Pensec was expected to inform the board of any delinquencies in shipping loans and to bring to the board's attention any loans which would result in total loans being in excess of the board's monetary limitations. During most of 1966 and 1967, no ship loans were presented to the board for approval or attention despite the fact that the monetary limitations had in fact been greatly exceeded. During this period, Pensec, when questioned about the status of the ship loans, assured the board that they were in good order.

3. McTaggert testified that K&M assumed control of these vessels as of Nov. 19, 1966, when the written agreement confirming the takeover was executed. McTaggert identified an agreement by Midland, signed by John Pensec as president, providing for the subordination to Israel Discount Bank of the obligations of the Bacalakis corporations to Midland. The amounts of indebtedness to be subordinated were left blank.

the initial $150,000 were provided to K&M. He testified that as funds were forwarded, K&M would execute blank promissory notes. The blanks were to be filled in by Moraites and Pensec as to the amount of the loan and the name of the company against which the loan would be booked. These advances to K&M were originally booked as loans against K&M's own corporations because the Bacalakis companies already had outstanding balances which were too high. Moraites had assured McTaggert, however, that K&M would have no obligation to repay these monies. The entire K&M expenditure in connection with the operation to salvage the Bacalakis vessels amounted to approximately $1,-700,000, of which about $1,000,000 was spent in 1967. The money was obtained from Midland Bank in the form of loans made with no collateral or security of any kind.

Appellant Pensec's involvement in the attempt to prevent the collapse and foreclosure on the Bacalakis ships is based upon both circumstantial and direct evidence. In January of 1968, Midland was being audited in connection with a proposed merger. The ship loan portfolio was excepted to because the files revealed no collateral as well as documentary inadequacies. As a result of this threatened impediment to the merger, an associate of the bank's counsel traveled to the K&M offices in London to obtain mortgages and to correct the documentary inadequacies. K&M provided additional sham notes and mortgages on the promise that all would be returned. McTaggert characterized these new notes and mortgages as "paper work" done so that the ship loans would pass the merger examination. A Midland director testified that Pensec continually assured the board that the ship loans were in good order. The bank's internal auditor testified that

Pensec had, when questioned about the ship loans, replied that they were adequately collateralized and that he, Pensec, had met the borrowers and knew them personally.

Midland's ship loan portfolio was criticized by the New Jersey Department of Banking and Insurance ("the Department") as early as October 26, 1966, when its yearly examination found the concentration of ship loans to be excessive. In 1967, a Department examiner reviewed the ship loan files and determined them to be basically unsecured although carried on Midland's books as collateralized. When the examiner confronted Pensec with these findings, appellant stated that the loans were collateralized but was unable to locate the proper documents. Ultimately some documentation was obtained from Moraites' offices. When the examiner's report reached the Department, the chief examiner wrote to Midland on July 19, 1967, concerning the ship loans, stating that their concentration threatened Midland's very existence and that the situation had to be rectified by negotiating the orderly reduction of the loans until Midland's involvement therein had been entirely eliminated.[4] This letter was reviewed by Pensec for Midland's executive committee; however, the language indicating the threat to Midland's "very existence" was omitted. Pensec answered the Department on August 16, 1967, stating that the letter had been reviewed in detail by the executive committee and promising that no additional ship loans would be made, that an orderly reduction would begin, and that loans in excess of statutory requirements had been corrected. Actually, these representations were all incorrect. The Department's letter had not been reviewed in detail, additional ship loans were made, monies received by Midland on outstanding ship loans were not used

4. The Department's letter noted that Pensec had promised to decrease the ship loans in February of 1967 but that as of April of 1967, they had in fact increased. The Department's examiners had specially noted or classified nearly 2.3 million dollars in ship loans, 2 million of which was in excess of the statutory limitations on lines of lending.

to reduce the loans but were credited to a checking account for use by K&M,[5] and the ship loans were still in excess of the statutory requirements. Another letter from appellant to the Department, dated October 18, 1967, purported to report the loan balances on Midland's ship loans as of that date. The figures given by appellant were substantially lower than the correct amounts that were outstanding.[6]

In January of 1968, Midland's outside auditor informed the bank's counsel that, as a result of his examination, he would be unable to certify Midland's condition for purposes of the proposed merger.

## II. THE CONSPIRACY

At the close of the Government's case and again after the defense had rested, appellant moved for a judgment of acquittal on the conspiracy count, contending that the Government had failed to prove the allegations of this count. The motions were denied as was a post-verdict motion for a new trial on the conspiracy count. Appellant assigns as error the denial of these motions.

Appellant argues that McTaggert testified that he had never agreed with appellant to defraud Midland or to misapply its funds nor did McTaggert testify that appellant had made such an agreement with Moraites. Appellant notes that the trial court stated that there was no testimony that Moraites ever indicated that he was involved with Pensec in an arrangement to split fees.

Appellant Pensec argues that the Government's case on the conspiracy count is based upon the role he had at the bank as the officer in charge of the ship loans. He asserts that while it may be true that only he had the authority to put a ship loan on Midland's books, it was not his responsibility to see that sufficient collateral was obtained for a loan or that there was adequate documentation in the bank's files. The thrust of appellant's argument is that Moraites was the de facto lending officer in charge of Midland's ship loans. Appellant argues that the various bank employees and directors went to Moraites whenever a problem arose with regard to the ship loans and that the Government failed to prove that Pensec played any part in a conspiracy to misapply funds via these loans.

The sufficiency of evidence of a conspiracy and the sufficiency of evidence that an individual defendant was a part of a conspiracy have been the subject of several of our recent decisions. See United States v. Addonizio [United States v. Gordon] 449 F.2d 100 (C.A. 3, 1971); United States v. De Cavalcante, 440 F.2d 1264 (C.A.3, 1971); United States v. Weber, 437 F.2d 327 (C.A.3, 1970), cert. denied, 402 U.S. 932, 91 S.Ct. 1524, 28 L.Ed.2d 867 (1971). As we stated in De Cavalcante, under the teachings of Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), the prosecution must establish by substantial evidence, restricted to proof aliunde, the existence of a conspiracy. Once the existence of a conspiracy is clearly established, slight evidence may be sufficient to connect a defendant with it. See also United States v. Cohen, 197 F.2d 26 (C.A.3, 1952).

There is no doubt that the evidence supports a finding by the jury that a conspiracy did exist. The unsecured loans to shipping companies in which

---

5. The checking account was in the name of Jopkat Compania Maritima, S.A. It had been opened by K & M in January 1967, and became a depository for funds advanced by Midland to K & M. The monthly statements of this account reveal continuous and substantial overdrafts which were covered by monies received on the ship loans and deposited in the Jopkat account instead of being used to reduce the loans.

6. The ship loans involved in this case were made to various Bacalakis corporations, all of which were controlled by K & M. Some of those corporations, Australine Shipping Company, Inc., Elmsley Steamship Corporation, Astrosplendor Compania Naviera, S.A., and Kalisto Compania Maritima, S.A., were listed by Pensec in his October 18 letter as having a total indebtedness to Midland of $415,965. The actual amount was $971,202, a difference of $555,237.

Moraites and Bacalakis had interests were in jeopardy of being exposed and becoming uncollectible. Moraites induced McTaggert and K&M to take over the operation of the ships with the understanding that K&M and its own companies would have no obligation to repay any funds advanced by Midland as loans but which were in fact funds to be used to bear the debts of and to operate the former Bacalakis ships.

■ The evidence of appellant's participation in this attempt to salvage the Bacalakis shipping companies is far more than slight. His attempts to conceal the extent and nature of Midland's position with regard to the loans made to the Bacalakis and K&M companies are evidenced by his own correspondence with the New Jersey Department of Banking and Insurance. His authorization of unsecured or undercollateralized loans and letters of credit and his supervision of the Jopkat checking account used to channel funds to K&M are supported by overwhelming testimony. We conclude that the evidence produced · by the Government is sufficient to support the judgment of conviction on the conspiracy count.

## III. THE INDICTMENT

With respect to Counts 2, 3 and 4 of the indictment charging him with substantive misapplication of bank funds,[7] appellant contends that the indictment failed to properly charge the elements of the crime and failed to set forth a plain, concise and definite statement of the offense as required by Rule 7(c) of the F.R.Crim.P. Appellant contends that in an indictment upon a statute, it is not sufficient to set forth the offense in the words of the statute unless those words of themselves fully set forth all the elements necessary to constitute the offense. Otherwise, the statutory language must be accompanied by a statement of the facts and circumstances which will inform the accused of the specific offense. He argues that, in order for an indictment to properly charge a crime within the meaning of 18 U.S.C. § 656, it must contain factual allegations sufficient to rebut any conclusion that the defendant was guilty of mere maladministration in the performance of his duties as an officer or director of a bank. In this regard, appellant directs our attention to the Supreme Court's decision in United States v. Britton, 107 U.S. 655, 2 S.Ct. 512, 27 L. Ed. 520 (1883), a case dealing with a predecessor statute to 18 U.S.C. § 656. The Court in *Britton* ruled that the term "misapplied" has no settled technical meaning as used in the statute and, consequently, the mere repetition of the term in an indictment is not sufficient to charge an individual with a crime. Relying on *Britton,* appellant contends that the instant indictment in Counts 2, 3 and 4 had to allege, *inter alia,* that he wilfully misapplied funds by converting them to his own use or the use of another, coupled with a statement of how the conversion was effected.[8]

■ Appellant admits that United States v. Fortunato, 402 F.2d 79 (C.A. 2, 1968), cert. denied, 394 U.S. 933, 89 S.Ct. 1205, 22 L.Ed.2d 463 (1969), re-

---

7. Counts 2, 3 and 4 of the restructured indictment recite, in pertinent part, that "John Pensec . . . an officer and director of the Midland Bank, located in Paramus, New Jersey, the deposits of which are insured by the Federal Deposit Insurance Corporation, did knowingly and wilfully misapply monies, funds or credits of the Midland Bank in that . . . John Pensec, without the prior approval of the Midland Bank's Board of Directors or Executive Committee caused to be made with intent to injure or defraud the Midland Bank, loans, in the approximate amount of . . . to the . . . .

"In violation of Title 18, United States Code, Sections 656 and 2."
Count 2 alleges loans of $266,000 to the Astrosplendor Compania Maritima, S.A.; Count 3 alleges loans of $328,728 to the Kalisto Compania Maritima, S.A.; Count 4 alleges loans of $10,000 to Lily Navigation, Inc.

8. Appellant cites United States v. Kahn, 381 F.2d 824 (C.A. 7), cert. denied, 389 U.S. 1015, 88 S.Ct. 591, 19 L.Ed.2d 661 (1967); United States v. Quinn, 365 F.2d 256 (C.A. 7, 1966); Mulloney v. United States, 79 F.2d 566 (C.A. 1,

lied on by the Government, is directly contra; however, he vigorously attacks the authorities cited by the Fortunato court and argues that the court gave no reasons for its holding. In *Fortunato*, the appellant made the identical argument presented in the instant case. The court held that the statutory concept of misapplication is not so vague or of such uncertain application as to require dismissal of the indictment. We need not consider whether, since the time of the Britton decision, the term "misapplied" has acquired a technical meaning sufficient in and of itself to charge an individual with a crime.[9] In this case we have an indictment wherein the first count charges and sets forth an elaborate conspiracy to misapply bank funds. The following three counts, those at issue here, name the same defendants involved in the conspiracy and charge that during a stated time period, Moraites and appellant wilfully misapplied bank funds in that they caused loans to be made in a stated total amount to a named recipient. We hold that Counts 2, 3 and 4 of the indictment meet the requirements of Rule 7(c) of the F.R.Crim.P. and that the district court did not err in refusing to dismiss them.

## IV. THE CHARGE

Appellant raises a number of issues with respect to the trial court's instructions to the jury.

(a) *Misapplication.* Appellant contends that the trial court erred in instructing the jury that the term "misapplication" should be given its common ordinary meaning and that "misapplication" is an unauthorized or unjustifiable or wrongful use of a bank's funds. Appellant argues that such a general definition may have permitted the jury to return a verdict of guilty on a theory of the crime other than that for which the grand jury indicted. The argument assumes that the grand jury indicted Pensec for granting loans without prior board approval and that the petit jury verdict was based upon a different theory of guilt, although he does not suggest what that theory could have been.

We have carefully examined the record and can find no specific objection by appellant to the court's instructions with regard to "misapplication." In fact, when the court offered to make its definition of the term more specific, counsel for appellant apparently decided as a matter of tactics to "let it go." He is, therefore, foreclosed from raising the point as error on appeal. See United States v. Polack, 442 F.2d 446 (C.A.3), cert. denied, 403 U.S. 931, 91 S. Ct. 2253, 29 L.Ed.2d 710 (1971), and United States ex rel. Cheeks v. Russell, 424 F.2d 647 (C.A.3, 1970), cert. denied, 400 U.S. 994, 91 S.Ct. 465, 27 L.Ed.2d 442 (1971).

(b) *Specific Intent.* Appellant contends that the trial court erred in not instructing the jury that in order to convict him on Counts 2 and 3, it had to find a specific intent to defraud the bank at each time funds were transferred to the borrower. This is patently contra to our decision in United States v. Matsinger, 191 F.2d 1014 (C. A.3, 1951), that several related transactions may form the basis of one count charging wilful misapplication of bank

---

1935), cert. denied, 296 U.S. 658, 56 S.Ct. 383, 80 L.Ed. 468 (1936), as cases that contain examples of indictments that were held to be sufficient and which, by comparison, demonstrate the insufficiency of the instant indictment.

9. There is authority for such an argument. Since 1883, the term "wilfull misapplication" has been considered in a number of cases. It has been held that the allegation of "wilfull misapplication" by incorporation includes the element of intent to injure or defraud. See Logsdon

v. United States, 253 F.2d 12 (C.A. 6, 1958); and Ramirez v. United States, 318 F.2d 155 (C.A. 9, 1963). See also United States v. Meyer, 266 F.2d 747, 754 (C.A. 5), cert. denied, Kennedy v. United States, 361 U.S. 875, 80 S.Ct. 138, 4 L.Ed.2d 113 (1959), where the court stated: "[A]t this late date no substantial question can be raised but that the words 'wilfully misapplies' as used in Sections 656 and 657 of Title 18 United States Code, mean a criminal misapplication rather than a mere act of maladministration."

funds. We find no error in the court's charge with regard to intent.

■ (c) *Reliance Upon Counsel.* Appellant assigns as error the trial court's refusal · to give his requested charge that the jury could acquit if it found that Pensec was acting in accordance with advice of counsel in granting the loans covered by Counts 2, 3 and 4. It is clear from the record that the court refused to give the requested instruction because it was unsupported by the evidence. Indeed, the court allowed counsel for appellant additional time to substantiate the request from the transcript, and counsel was unable to do so. Our own examination of the record has convinced us that the trial court did not err in refusing to charge the jury with respect to reliance on counsel.

Appellant has raised other arguments with respect to the court's charge; however, we find them to be without merit. The remaining contentions by appellant are also without merit and require no extended discussion. Upon consideration of the record as a whole, we find that the trial was conducted fairly and with careful regard for the rights of the appellant.

Accordingly, the judgment of conviction will be affirmed.