**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**David P. TOKOPH,
Defendant-Appellant.**

**No. 74–1449.**

United States Court of Appeals,
Tenth Circuit.

Submitted on Briefs Jan. 22, 1975.

Decided April 24, 1975.

598

Alfred M. Carvajal, Albuquerque, N. M., for defendant-appellant.

Victor R. Ortega, U. S. Atty., Harris L. Hartz, Asst. U. S. Atty., Albuquerque, N. M., for plaintiff-appellee.

Before HILL, SETH and HOLLOWAY, Circuit Judges.

HILL, Circuit Judge.

This is a direct appeal from appellant's conviction of violating 18 U.S.C. § 1014 (two counts), 18 U.S.C. § 656 and 18 U.S.C. § 2 (five counts), 18 U.S.C. § 215 and 18 U.S.C. § 2 (five counts), and 18 U.S.C. § 371[1] (one count). All counts

---

1. 18 U.S.C. § 1014 provides in pertinent part:

"Whoever knowingly makes any false statement or report, or willfully overvalues any land, property or security, for the purpose of influencing in any way the action of . . . any bank the deposits of which are insured by the Federal Deposit Insurance Corporation . . . upon any application, advance, discount, purchase, purchase agreement, repurchase agreement, commitment, or loan, or any change or extension of any of the same, by renewal, deferment of action or otherwise, or the acceptance, release, or substitution of security therefor, shall be fined not more than $5,000 or imprisoned not more than two years, or both."

18 U.S.C. § 656 provides in pertinent part:

"Whoever, being an officer, director, agent or employee of, or connected in any capacity with any Federal Reserve bank, member bank, national bank or insured bank . . . embezzles, abstracts, purloins or willfully misapplies any of the moneys, funds or credits of such bank or any moneys, funds, assets or securities intrusted to the custody or care of such bank, or to the custody or care of any such agent, officer, director, employee or receiver, shall be fined not more than $5,000 or imprisoned not more than five years, or both . . . ."

18 U.S.C. § 2 provides:

"(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

"(b) Whoever willfully causes an act to be done which if directly performed by him or

involve violations surrounding the making of loans by Harry Weil, at all material times a branch manager of the Albuquerque National Bank (hereinafter Bank), to appellant, appellant's corporation First Southwest Corporation (hereinafter First Southwest) or persons appellant brought to Weil.

Viewing the evidence in the light most favorable to the government, the following are the relevant facts. Appellant began borrowing money from the Bank in April, 1972; he always dealt with Weil until Weil resigned. Although appellant and First Southwest made about 17 loans with the Bank, only loans involved in the alleged misapplications of bank funds and kickbacks are detailed.

In June, 1972, appellant told Weil a business concern, Montgomery Apartments (which appellant's father, Richard Tokoph, was involved in), needed $90,000. Weil testified that he agreed to make the loan for $100,000 and then have Montgomery Apartments return $10,000 to appellant and him. The loan was signed by appellant and two persons connected with Montgomery Apartments. The loan was not approved by the Bank's loan committee, and a Bank officer testified the committee would not have approved the loan. The collateral was apparently Montgomery Apartments' stock and no statement on that entity was provided. Weil testified that he suggested to appellant that appellant have the $10,000 check made out to Walter Rencehausen, an acquaintance of

Weil. Appellant apparently told his father and his father's partner, Waldo Wiest, that Rencehausen was the broker who had arranged the financing. Appellant brought the $10,000 check to the Bank; Weil had Rencehausen endorse it.[2] Weil gave Rencehausen $1,000 to purchase an interest in Rencehausen's bicycle shop and kept $4,000. Weil testified $5,000 was used to purchase a cashier's check made out to Thomas Fallon, one of appellant's brothers; appellant forged Fallon's endorsement and endorsed his own name under the Fallon forgery. Appellant used the $5,000 to pay off a note, open an account for First Southwest, and get some cash.

On July 10, 1972, Weil loaned First Southwest $25,000 (appellant also personally signed the note). Collateral for the loan was the assignment of a $25,000 note from John Grossman (a relative of appellant), of Arizona, to First Southwest; the Grossman note was secured by the assignment of 25,000 shares of Aaron Industries stock. Weil did not attempt to determine that stock's value before making the loan or submit the matter to the loan committee (it was reported to the committee). Weil testified he and appellant were to receive $2,500 for granting the loan. Grossman received only $21,250 of the proceeds. On July 18, 1972, Weil loaned First Southwest $35,500. This money was used to purchase land costing approximately $22,500 and to pay off another loan (Weil had previously loaned First Southwest $2,500

another would be an offense against the United States, is punishable as a principal."

18 U.S.C. § 215 provides in pertinent part: "Whoever, being an officer, director, employee, agent, or attorney of any bank, the deposits of which are insured by the Federal Deposit Insurance Corporation . . ., except as provided by law, stipulates for or receives or consents or agrees to receive any fee, commission, gift, or thing of value, from any person, firm or corporation, for procuring or endeavoring to procure for such person, firm, or corporation, or for any other person, firm, or corporation, from any such bank or corporation, any loan or extension or renewal of loan or substitution of security, or the purchase or discount or acceptance of any paper, note, draft, check, or bill of exchange by any

such bank or corporation, shall be fined not more than $5,000 or imprisoned not more than one year or both."

18 U.S.C. § 371 provides in pertinent part: "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both."

2. Rencehausen apparently was innocent of any wrongdoing. He testified that he was led to believe he was a broker for First Southwest and would receive training in the brokerage business.

presumably for a deposit on this property). Weil testified appellant promised Weil half of any profit obtained from the land's resale. Collateral was the land itself and certificates of deposit which were later used to cross-collateralize other loans.

First Southwest issued two checks to Rencehausen: one dated July 12, 1972, for $1,525, and another dated July 20, 1972, for $1,250. Rencehausen apparently deposited $250 at the Bank, used $1,400 to open an account at another bank, and loaned Weil $1,000.

The largest loan was made on July 24; Weil loaned First Southwest $200,000 with collateral being a McDonnell 220 jet. First Southwest paid approximately $75,000 for the jet; the rest of the funds were to be used to refurbish this one-of-a-kind plane. The loan proceeds were delivered all at once; normally they would have been disbursed as the work was performed. This loan was reported to the loan committee after it was made. Weil testified that the intent was for appellant to take out $5,000 and for Weil to receive $5,000, and that they also agreed Weil was to receive $25,000 of the proceeds from the aircraft's sale. First Southwest subsequently issued a $5,000 check to Rencehausen. Weil testified $4,000 was applied to a note of Rencehausen's and he (Weil) kept $1,000.

The final loan involving a kickback was made by Weil to First Southwest on September 11, 1972. This loan in the amount of $75,000 was very similar to the Grossman transaction. First Southwest used the proceeds to make a loan to Diversified Natural Resources Corporation (Diversified). Diversified received only $62,500. The Bank received as collateral a note in the amount of $75,000 from Diversified, Aaron Industries, and three individuals to First Southwest; 75,000 Aaron Industries shares; and a security interest in some oil well rigging equipment. Weil did not submit or report this loan to the loan committee. Testimony indicated banking practices would have prevented granting this loan. First Southwest issued a $3,525 check to Rencehausen; Rencehausen deposited the check and $3,000 was used to pay off a $3,000 note of Rencehausen which had been used to buy stock in Weil's name for both Rencehausen and Weil.

During the course of the transactions, Weil requested financial statements from appellant. Appellant's personal statement dated August 31, 1971, showed a net worth of $88,421. The financial statement of First Southwest dated June 30, 1972, showed a net worth of $254,175. There was evidence that appellant bought Weil a $150 coat and paid for Weil's accommodations on some pleasure trips. Weil resigned from his position in September, 1972, when asked to do so.

A grand jury indictment of 23 counts was filed against Weil and appellant on October 23, 1973. Weil pleaded guilty to the conspiracy count and not guilty to the other counts. At appellant's trial, Weil testified for the government. The government offered lengthy testimony and voluminous exhibits to trace the funds appellant used for himself, First Southwest, and McDonnell 220 (another corporation appellant controlled). Most of the funds were traced to bank loans. Evidence also was presented to show the small amount of business conducted by appellant's corporations. The "bookkeeper" of appellant's operations prepared a summary of the total proceeds of checks drawn on the corporate accounts. This summary indicated $61,587.84 had gone to appellant as cash loans and draws. By trial time, $60,000 had been paid on the loan for Montgomery Apartments, and no payments had been made on the other four loans involving kickbacks.

The jury returned a verdict finding appellant guilty of thirteen counts.

■ Appellant first argues that his conviction for five counts of aiding and abetting in the commission of violations of 18 U.S.C. § 215 must be reversed because the indictment fails to state an offense under the United States Code. Section 215 prohibits, *inter alia*, bank officers, directors, employees, agents or at-

torneys from receiving any fee, commission, gift or thing of value for procuring any loan (except as provided by law). Appellant contends he cannot be found guilty of aiding and abetting because he was not a bank officer, director, employee, agent or attorney, and also because § 215 does not condemn the *giving* of a gift or commission but only the *receiving* of a gift or commission.

This argument ignores the clear intent of 18 U.S.C. § 2 to reach appellant's acts. Congress laid this argument to rest when it amended § 2 in 1951. In describing the amendment, Senate Report No. 1020 stated:

> "This section is intended to clarify and make certain the intent to punish aiders and abettors regardless of the fact that they may be incapable of committing the specific violation which they are charged to have aided and abetted." 1951 U.S.Code Congressional and Administrative Service, pp. 2578, 2583.

This report specifically mentions the statutory forerunner of § 215. Thus, we believe Congress' intent to reach appellant's conduct is clear; the use of § 2 here does not distort congressional intent in enacting § 215 but merely effectuates the clear intent of Congress in amending § 2.

It has long been recognized that although " 'a defendant was incompetent to commit the offense as principal by reason of not being of a particular age, sex, condition, or class, he may, nevertheless, be punished as procurer or abettor.' " United States v. Lester, 363 F.2d 68 (6th Cir. 1966), cert. den'd, 385 U.S. 1002, 87 S.Ct. 705, 17 L.Ed.2d 542 (1967), quoting, United States v. Snyder, 14 F. 554, 556 (C.C.Minn.1882).

The appellant was not a mere innocent borrower when the evidence is viewed in the light most favorable to the government. This is a critical difference between this case and the examples appellant gives where criminal sanctions are imposed only upon one party to an activity, *e. g.*, the usurious lender (not the usurious borrower), the employer not paying the minimum wage (not the employee accepting the illegal wage). The conduct punished here is not appellant's *giving* commissions for the loans but his aiding and abetting Weil, the bank officer, in the *receipt* of the commissions. Thus, the fact Congress has specifically prohibited both *giving* and *receiving* in several statutes, *e. g.*, bribes (18 U.S.C. § 201), compensation to congressmen and government officers and employees (18 U.S.C. § 203), does not indicate a congressional intent to sanction aiding and abetting as herein disclosed.

We believe the indictment did state an offense under the United States Code when it charged appellant with aiding and abetting in the commission of violations of § 215.

Appellant next attacks his conviction on two counts for violating 18 U.S.C. § 1014. Appellant's two-pronged argument is (1) there was no evidence that the financial statements of himself and First Southwest were submitted for the purpose of influencing bank action, and (2) there was no evidence the financial statements were false.

■ Appellant, taking a narrow view of § 1014, contends no crime has been committed unless false financial statements are submitted for the purpose of *influencing the bank upon a loan application.* By its very language, the statute encompasses false statements submitted for other purposes; the statute imposes penalties on:

> "[w]hoever knowingly makes any false statement or report, or willfully overvalues any land, property or security, for the *purpose of influencing in any way the action of* . . . any bank the deposits of which are insured by the Federal Deposit Insurance Corporation . . . *upon any application* . . . or loan, *or any change or extension of any of the same, by renewal, deferment of action or otherwise* . . . ." [Emphasis added.]

It is true, as appellant argues, that the evidence indicates the financial statements were not submitted to influence Weil in any way in granting the loans.

The indictment, however, says the financial statements were submitted ". . . for the purpose of influencing the action of said bank with regard to the granting, extending, deferring of action upon, or other modifications of loans . . ." The government argues the financial statements were meant to influence the Bank by forestalling an inquiry that would certainly affect the Bank's future conduct regarding "granting, extending, deferring action upon or other modification of loans" to appellant and First Southwest.

Weil testified that he had explained to appellant that he needed the financial statements for the examiners and the Bank's own auditors. Weil said, "The reason that I asked him for these is that when bank examiners or our own auditors check the files, that you should have something in there to justify the amount of money that was borrowed . . . ." We believe this testimony combined with other testimony concerning the relationship of the parties at that time would allow a jury to find beyond a reasonable doubt that appellant submitted the financial statements with the purpose to influence the Bank to defer action on the loans at some future time. In discussing the principle that reliance is not an element of a § 1014 prosecution, the Third Circuit said:

> It [§ 1014] is not merely directed to false statements which are actually used in the decision to make a loan. It requires that all statements supplied to lending institutions . . . which have the capacity to influence them, be accurate or at least not knowingly false . . . .

United States v. Goberman, 458 F.2d 226 (3rd Cir. 1972).

■ The second prong of attack on appellant's § 1014 conviction, that no evidence was introduced showing the statements to be materially false, is also untenable. In deciding this question, which we interpret as saying the evidence was insufficient as to this element to sustain his conviction under § 1014, we view the evidence in the light most favorable to the government to determine if there is sufficient proof, direct and circumstantial, together with reasonable inferences to be drawn therefrom from which a jury might find a defendant guilty beyond a reasonable doubt. United States v. Kramer, 500 F.2d 1185 (10th Cir. 1974). It would unduly lengthen this opinion to set out each specific piece of testimony on this subject. Our review of the record indicates large amounts of proof concerning the incorrect valuation of assets and false claims of ownership concerning several items on both financial statements. Thus, we hold there was sufficient proof available for the jury to determine beyond a reasonable doubt that materially false statements were made on both financial statements.

In relation to the counts of aiding and abetting in violation of § 656 and the count of conspiring to violate § 656, appellant argues the government failed to show that Weil intended to injure or defraud the Bank and that any community of unlawful purpose existed between Weil and appellant in violation of § 656. Appellant contends the overwhelming evidence indicates appellant had no intent to injure or defraud the Bank.

■ An intent to injure or defraud a covered institution is an essential element of a § 656 prosecution. See, e. g., United States v. Giordano, 489 F.2d 327 (2d Cir. 1973). This court has held that the requisite intent can be inferred from the facts and circumstances shown at trial and that intent is basically a fact question for the jury. United States v. Acree, 466 F.2d 1114 (10th Cir. 1972), cert. den'd, 410 U.S. 913, 93 S.Ct. 962, 35 L.Ed.2d 278 (1973). For a person to be found guilty of aiding and abetting a § 656 violation, the bank officer must be guilty of violating § 656 and there must be proof the aider and abettor had knowledge of the bank officer's criminal activity and encouraged or participated in it. United States v. Giordano, supra. This intent requirement, however, does not mean that the *motive* of the parties must have been to injure or defraud the bank; the intent may be shown by ". .

an unlawful act voluntarily done, the natural tendency of which may have been to injure the bank." Galbreath v. United States, 257 F. 648 (6th Cir. 1918).

■ Appellant points to evidence which indicates that Weil took normal procedures in making the loans and that the loans were repaid or collateral repossessed. This evidence is said to indicate Weil and appellant did not intend to injure or defraud the Bank. Whether or not the loans were repaid or the Bank actually suffered a loss is not material to a § 656 charge. "The offense occurred and was complete when the misapplication took place." United States v. Acree, *supra.* As to Weil's following normal banking practices, there was considerable evidence he did not seek loan committee approval for several loans which should have been presented to the committee. George Jenks, a Bank officer, testified that several of these loans would not have been approved by the loan committee. In relation to one loan, Weil testified he protected the Bank as best he could but agreed he still arranged for a remuneration for himself out of that loan. Weil's testimony indicates he had abandoned his position of trust as a loan officer and was acting in his self-interest. *See* United States v. Bevans, 496 F.2d 494 (8th Cir. 1974).

The evidence viewed in the light most favorable to the government establishes that appellant paid Weil kickbacks for granting several loans. Appellant's explanation concerning his relationship to Rencehausen was available for the jury to consider and apparently was not believed. The evidence also shows that false financial statements had been filed by appellant. The evidence further indicates appellant used large amounts of the loan proceeds for his own lavish life style. Appellant claims there was no evidence he ever denied his obligations to the Bank which indicates he had no intent to injure or defraud the Bank; that lack of proof is not decisive. There was some evidence appellant had not fully cooperated with the Bank.

■ We believe this evidence and other voluminous testimony and exhibits presented at the trial would have allowed a jury to determine beyond a reasonable doubt that Weil had an intent to injure or defraud the Bank as required under § 656 and that appellant had knowledge of Weil's criminal activity and participated in it.

The conviction of appellant for aiding and abetting the violations of §§ 215 and 656 is attacked on a further ground. Appellant argues because Weil, the principal and Bank officer, has not been found guilty of the substantive crimes of the indictment there can be no conviction of appellant for aiding and abetting the commissions of the substantive crimes.

■ The guilt of the bank officer is an essential element in the crime of aiding and abetting a violation of § 215 or § 656. We cannot, however, agree that the principal's *conviction* is necessary to the conviction of the aider and abettor of a violation of § 215 or § 656. *Contra* United States v. Stevison, 471 F.2d 143 (7th Cir. 1972), cert. den'd, 411 U.S. 950, 93 S.Ct. 1933, 36 L.Ed.2d 411 (1973). There is a difference between the conviction of the principal, the bank officer, and proof of the principal's guilt. *See* Giragosian v. United States, 349 F.2d 166 (1st Cir. 1965).

In this case, the judge instructed the jury that to establish the aiding and abetting counts several essential elements had to be proved beyond a reasonable doubt. These instructions required the jury to find that Weil had committed violations of §§ 215 and 656 in order to find appellant guilty of aiding and abetting. It was not necessary for Weil to be convicted of the substantive offense; it was sufficient that the government established, beyond a reasonable doubt, that Weil, a Bank officer, had committed the violations of §§ 215 and 656 and that appellant aided and abetted in those violations.

Appellant next complains of the failure to suppress his grand jury

testimony.[3] Based on the following colloquy, appellant says that he invoked his privilege against self-incrimination, that the government had a duty to stop questioning him and that any interrogation after that point was unconstitutional and should have been suppressed:

Mr. Hartz (prosecuting attorney): "Now, I told you outside, and I will state this again, that the purpose of this inquiry is to investigate possible unlawful activities in the acquisition of loans by you from the First National Bank.

"Now, anything you say here can be used against you in court, and you can't be compelled to incriminate yourself here."

. . . . .

Mr. Hartz: "Also, I mentioned forty-five minutes ago that you have a right to have your attorney outside this room, and if you desire to consult with him, you can do that, but I understand you don't have an attorney here, is that correct?"

Mr. Tokoph: "That's correct."

Mr. Hartz: "Now, first of all, would you like to make any statement to the grand jury?"

Mr. Tokoph: "No, not at this time."

██ Based upon the record at the grand jury proceedings, we believe appellant was not invoking his privilege against self-incrimination but was merely indicating he did not desire to make an opening general statement. Appellant proceeded to answer the vast majority of the questions propounded to him. Any unwillingness to answer subsequent questions was based on his apparent

3. The record shows the government did not use appellant's grand jury testimony in its case in chief.

4. Count IX is typical of the counts attacked:
"On or about the 10th day of July, 1972, in the State and District of New Mexico, the defendant, HARRY E. WEIL, being an officer and employee, that is, manager of the East Menaul Branch Office of the Albuquerque National Bank, the deposits of which were then insured by the Federal Deposit Insurance Corporation, did wilfully, knowingly, and unlaw-

feeling the questions were irrelevant. Appellant several times encouraged the prosecutor to get to the heart of the matter.

██ The privilege against self-incrimination, of course, is applicable to grand jury proceedings. Kastigar v. United States, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). Here we cannot believe that appellant was attempting to indicate that he wished to remain silent; consequently we reject appellant's reliance on *Miranda's* language that interrogation must cease if the person indicates in any manner he wishes to remain silent. Appellant has not contended there was any inadequacy of warnings to appellant.

Appellant again attacks the counts of the indictment alleging aiding and abetting the commission of § 656, misapplication of bank moneys and funds.[4] He argues the allegations of the indictment are insufficient to state an offense under the United States Code because they do not set forth all the facts necessary to show how the misapplication was made and that it was an unlawful one.

██ The test we employ in determining an indictment's legal sufficiency is "whether it contains the elements of the offense charged and apprises the accused of the nature of the charge, so as to enable him to prepare a defense and to plead the judgment in bar." Mims v. United States, 332 F.2d 944 (10th Cir. 1964), cert. den'd, 379 U.S. 888, 85 S.Ct. 158, 13 L.Ed.2d 92 (1964). Although there is authority to the contrary, some courts specifically have stated that an indictment under § 656 need not set out the means by which the offense was

fully misapply and cause to be misapplied moneys and funds of the said Bank in the amount of $25,000.00 in that he caused to be made with intent to injure and defraud said Bank a loan in the amount of $25,000 to First Southwest Corporation. The defendant, DAVID P. TOKOPH, knowingly, wilfully and unlawfully did aid, abet, counsel, induce and procure defendant HARRY E. WEIL to commit said misapplication of $25,000.00.
"In violation of 18 USC 656 and 18 USC 2."

committed. United States v. Bearden, 423 F.2d 805 (5th Cir. 1970), cert. den'd, 400 U.S. 836, 91 S.Ct. 73, 27 L.Ed.2d 68 (1970), quoting United States v. Fortunato, 402 F.2d 79 (2d Cir. 1968), cert. den'd, 394 U.S. 933, 89 S.Ct. 1205, 22 L.Ed.2d 463 (1969). This court cited those cases in United States v. Archambault, 441 F.2d 281 (10th Cir. 1971), cert. den'd, 404 U.S. 843, 92 S.Ct. 140, 30 L.Ed.2d 78 (1971), and applied their rationale in United States v. Cooper, 464 F.2d 648 (10th Cir. 1972), cert. den'd, 409 U.S. 1107, 93 S.Ct. 901, 34 L.Ed.2d 688 (1973), upholding an indictment under § 656 for misapplication.

■■■ The indictment here states that the misapplication was unlawful. It contains the elements of the offense and indicates the particular transaction in question. Here the indictment indicated the making of loans to the named party with the intent to injure or defraud the Bank was the misapplication of funds by an officer of a bank insured by the Federal Deposit Insurance Corporation. We believe this indictment meets the test of legal sufficiency. *See* United States v. Moraites, 456 F.2d 435 (3rd Cir. 1972), cert. den'd, 409 U.S. 891, 93 S.Ct. 109, 34 L.Ed.2d 148 (1972).

Contrary to appellant's assertion we do not believe the "Wharton rule" compels reversal of the conspiracy count, conspiracy to violate §§ 656 and 1014.

The Wharton rule operates to prevent conviction both of conspiracy and the substantive offense where the substantive offense could not have been committed without concerted action, so that the conspiracy is really identical with or included within the substantive offense.

United States v. Nasser, 476 F.2d 1111 (7th Cir. 1973).

■■■ Logic compels a determination that misapplication of bank funds can be committed by one person. United States v. Klock, 210 F.2d 217 (2d Cir. 1954). One person can make false statements and reports to a bank to influence the bank's future action or deferring of action on a loan. Accordingly, the Wharton rule would not operate to prevent conviction under this conspiracy count.

The final attack on the conviction is based on a contention that great local prejudice against the appellant resulted from widespread and damaging pretrial publicity and that this publicity prevented appellant from receiving a fair trial in the District of New Mexico. Consequently, appellant argues the trial court committed reversible error in denying a motion for change of venue.

Appellant points to four newspaper articles which deal with the charges pending against Weil and appellant and/or Weil's guilty plea. One newspaper contains photographs of Weil and appellant. From this evidence, and the fact the Bank was the largest in Albuquerque, appellant says that it was impossible to select a jury which did not have previous knowledge of appellant's reported association with Weil and that because Weil had already pleaded guilty it was a natural human tendency for a jury selected in Albuquerque to consider appellant guilty by association.

■■■ "The granting of a motion for change of venue under Rule 21 [5] is specifically within the discretion of the trial judge." United States v. Jobe, 487 F.2d 268 (10th Cir. 1973), cert. den'd, 416 U.S. 955, 94 S.Ct. 1968, 40 L.Ed.2d 305 (1974). We are bound to give great deference to a trial court's discretion when reviewing change of venue motions. United States v. Smaldone, 485 F.2d 1333 (10th Cir. 1973), cert. den'd, 416 U.S. 936, 94 S.Ct. 1934, 40 L.Ed.2d 286 (1974).

■■■ The clippings included in the record on appeal are not of a sensational

---

**5.** F.R.Crim.P. 21(a) provides:

"For Prejudice in the District. The court upon motion of the defendant shall transfer the proceeding as to him to another district whether or not such district is specified in the defendant's motion if the court is satisfied that there exists in the district where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial at any place fixed by law for holding court in that district."

or accusatorial nature; they are factual accounts of court proceedings and pleadings. *See* Hale v. United States, 435 F.2d 737 (5th Cir. 1970), cert. den'd, 402 U.S. 976, 91 S.Ct. 1680, 29 L.Ed.2d 142 (1971). The trial judge consistently questioned prospective jurors as to their prior knowledge of this case. Only one prospective juror admitted having prior knowledge and he was excused. The law will not presume that jurors were exposed to the publicity or were prejudiced thereby. Welch v. United States, 371 F.2d 287 (10th Cir. 1966), cert. den'd, 385 U.S. 957, 87 S.Ct. 395, 17 L.Ed.2d 303 (1966). The pretrial publicity was not shown to be so highly prejudicial or pervasive that appellant could not receive a fair or impartial trial in the District of New Mexico. Consequently, we hold the totality of facts presented by this record does not justify reversal.

Affirmed.