**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Weldon Rushing PAYNE, Lloyd Earl
Taylor, Defendants-Appellants.**

**No. 83–7177.**

United States Court of Appeals,
Eleventh Circuit.

Jan. 15, 1985.

Roney, Circuit Judge, filed specially concurring opinion.

Frederick G. Helmsing, Mobile, Ala., for Payne.

W. Kenneth Gibson, Fairhope, Ala., for Taylor.

J.B. Sessions, III, Asst. U.S. Atty., Mobile, Ala., Mervyn Hamburg, Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before RONEY and KRAVITCH, Circuit Judges, and ALLGOOD *, District Judge.

KRAVITCH, Circuit Judge:

Appellants Weldon Rushing Payne and Lloyd Earl Taylor appeal their respective convictions on charges arising from loans made by the Federal Land Bank Association of Robertsdale, Alabama, between 1977 and 1980. The jury found both appellants guilty on five counts of misapplication of Federal Land Bank funds (18 U.S.C. § 657[1]), four counts of unlawful participation in the proceeds of Federal Land Bank loans, or aiding and abetting the same (18 U.S.C. §§ 1006[2] and 2[3]), and one count of conspiracy to violate various false statement, misapplication, and unlawful participation statutes (18 U.S.C. § 371[4]). In addition, the jury found Payne guilty on one additional count of unlawful participation in the proceeds of Federal Land Bank

---

* Honorable Clarence W. Allgood, U.S. District Judge for the Northern District of Alabama, sitting by designation.

1. 18 U.S.C. § 657 provides in pertinent part:
   Whoever, being an officer, agent or employee of or connected in any capacity with ... any land bank [or] intermediate credit bank, ... embezzles, abstracts, purloins or willfully misapplies any moneys, funds, credits, securities or other things of value belonging to such institution, or pledged or otherwise intrusted to its care, shall be fined not more than $5,000 or imprisoned not more than five years, or both; but if the amount or value embezzled, abstracted, purloined or misapplied does not exceed $100, he shall be fined not more than $1,000 or imprisoned not more than one year, or both.

2. 18 U.S.C. § 1006 provides in pertinent part:
   Whoever, being an officer, agent or employee of or connected in any capacity with ... any land bank [or] intermediate credit bank, ... with intent to defraud any such institution or any other company, body politic or corporate, or any individual, or to deceive any officer, auditor, examiner or agent of any such institution or of department or agency of the United States, makes any false entry in any book, report or statement of or to any such institution, ... or, with intent to defraud the United States or any agency thereof, or any corporation, institution, or association referred to in this section, participates or shares in or receives directly or indirectly any money, profit, property, or benefits through any transaction, loan, commission, contract, or any other act of any such corporation, institution, or association, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

3. 18 U.S.C. § 2 provides in pertinent part:
   (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

4. 18 U.S.C. § 371 provides in pertinent part:
   If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

loans, or aiding and abetting the same (18 U.S.C. §§ 1006 and 2), and three counts of making false statements on Federal Land Bank forms (18 U.S.C. § 1006).

On appeal, Taylor contends that (1) he was not "connected in any capacity with" the Federal Land Bank for purposes of 18 U.S.C. §§ 657 and 1006, (2) the evidence of misapplication was insufficient, (3) the evidence of unlawful participation was insufficient, (4) the trial court abused its discretion by refusing to grant a severance, (5) the trial court denied him the right of cross-examination, and (6) the trial court should have provided him with a complete trial transcript for purposes of his appeal. Payne contends that (1) the evidence of misapplication was insufficient, (2) the evidence that he aided and abetted Taylor's unlawful participation was insufficient, (3) the "exculpatory no" doctrine requires the reversal of his false statement convictions, (4) the questions on the Federal Land Bank forms were "vague and ambiguous," (5) the evidence of conspiracy was insufficient, and (6) the trial court abused its discretion by refusing to grant a severance.

We hold that the evidence introduced at trial was insufficient to establish that either Taylor or Payne misapplied Federal Land Bank funds, and we therefore reverse the appellants' misapplication convictions. We reject the appellants' remaining claims, however, and we affirm all of their remaining convictions.

## I. FACTS

The Federal Land Bank of New Orleans (FLBNO) is one of twelve Federal Land Banks created by Congress to handle the special credit needs of farmers. The FLBNO provides loan funds to borrowers through thirty-three Federal Land Bank Associations, including the Federal Land Bank Association of Robertsdale, Alabama (FLBAR). Appellant Weldon Payne began working for the FLBAR in 1974, and became its president in 1978. Appellant Lloyd Taylor, a real estate lawyer, was placed on the FLBNO list of "approved loan closing attorneys" in 1974. Taylor became the "retained counsel" for the FLBAR on December 30, 1977, a position he held until February 22, 1980. A third codefendant, Robert Gulledge, president of the Baldwin National Bank in Baldwin County, Alabama, borrowed money from the FLBAR in 1977 and 1980.[5]

### A. The Relevant Transactions

The charges in this case stemmed from several transactions involving farm land in Baldwin County, Alabama, between 1977 and 1980. The transactions were financed, in large part, by loans arranged through the FLBAR and the FLBNO. The transactions relevant to this appeal include the following:

#### (1) The Bonner-Dale Taylor-Thead Transactions

In 1975, Jerry and Merrill Bonner borrowed $200,000 from the FLBAR, using 400 acres of land in Baldwin County, Alabama, as security for the loan. The annual payments on the loan were due each May 1. On May 1, 1979, the Bonners failed to make the scheduled loan payment. On May 15, Jerry Bonner told Payne that he was thinking about selling a portion of the 400 acres to help make the overdue loan payment. Payne suggested to Bonner that Lloyd Taylor might be interested in buying the property. The Bonners met with Lloyd Taylor and his brother, Dale Taylor, to discuss a possible sale. On June 28, 1979, Lloyd Taylor (as secretary of T & T Farms, a partnership consisting of Lloyd and Dale Taylor) and the Bonners executed a purchase agreement for a 140-acre portion of the property for $290,000. On September 3, 1979, the right to purchase the 140 acres was assigned to Dale Taylor.

Meanwhile, sometime in May or June, 1979, Payne suggested to Edward Ronald Thead that Thead purchase the 140 acres from Lloyd Taylor. On July 3, 1979, Thead

---

5. Gulledge filed a separate appeal in this case. *See United States v. Gulledge,* 739 F.2d 582 (11th Cir.1984).

and Lloyd Taylor (as secretary of T & T Farms) executed an option for the 140 acres for $363,000. Thead paid $2,000 for the option. In July or August, 1979, Thead told Payne that he did not intend to exercise the option. Payne encouraged Thead to complete the purchase and offered to defer or make the loan payments for Thead in the event Thead could not make those payments himself.

On September 26, 1979, Dale Taylor completed the purchase of 60 acres (out of the total of 140 acres) from the Bonners for $110,000. Immediately thereafter, Dale Taylor resold the 60 acres to Thead for $135,000. Thead financed his purchase with a portion of the proceeds of a $297,000 loan from the FLBAR. At the closing, Payne instructed Thead to set aside and save $38,990.44 out of the loan proceeds. Lloyd Taylor served as the loan closing attorney for Thead.

The $135,000 paid to Dale Taylor by Thead on September 26, 1979, was deposited in the partnership account of T & T Farms. The same day, a $110,000 check was written from the partnership account to pay the Bonners. A second check, for $11,000, was written from the partnership account to the trust account of Lloyd Taylor's law firm. The deposit in the trust account was credited to Dale Taylor. On September 27, Lloyd Taylor wrote a $4,500 check, payable to cash, from the trust account. On September 28, Lloyd Taylor again wrote a $4,500 check, payable to cash, from the trust account. Lloyd Taylor cashed both of the $4,500 checks, which were debited to Dale Taylor on the trust account ledger card.

On October 3, 1979, Dale Taylor completed the purchase of the remaining 80 acres from the Bonners for $180,000. Immediately thereafter, Dale Taylor resold the 80 acres to Thead for $226,450. Thead financed his purchase, in part, with the proceeds of a $195,000 loan from the FLBAR.

Thead also wrote two checks to Dale Taylor, one for $38,900 and one for $3,100. The $38,900 check represented the remainder of the proceeds of the earlier FLBAR loan that Thead had set aside at the direction of Payne. Lloyd Taylor again served as the loan closing attorney for Thead.

The $226,450 paid to Dale Taylor by Thead on October 3, 1979, was deposited in the trust account of Lloyd Taylor's law firm and credited to Dale Taylor. The same day, a $175,000 check was written from the trust account to pay the Bonners. A second check, for $4,500, payable to cash, was written from the trust account and was cashed by Lloyd Taylor. A third check, for $20,000, was written from the trust account to Dale Taylor. Lloyd Taylor endorsed the $20,000 check and deposited it in the partnership account of T & T Farms. Between October 5 and October 13, Lloyd Taylor wrote three checks from the partnership account, payable to cash, in the amounts of $4,500, $9,000, and $8,000. Lloyd Taylor cashed the three checks.

These transactions formed the basis for Counts Four and Five (charging Lloyd Taylor and Payne with unlawful participation in the proceeds of Federal Land Bank loans, or aiding and abetting the same, in violation of 18 U.S.C. §§ 1006 and 2) and Counts Six and Seven (charging Lloyd Taylor and Payne with misapplication of Federal Land Bank funds in violation of 18 U.S.C. § 657).[6] In addition, six of the twenty-five overt acts listed in Count One (charging Lloyd Taylor, Payne, and Gulledge with conspiracy in violation of 18 U.S.C. § 371) were related to these transactions. Lloyd Taylor and Payne both were convicted on Counts Four, Five, Six, and Seven.

(2) *The Dial & Lipscomb-Dale Taylor-Daugherty Transactions*

In August, 1979, Payne encouraged William Daugherty to purchase a 60-acre tract

6. These transactions also formed the basis for Count Seventeen (charging Payne with making false statements on a Federal Land Bank loan application in violation of 18 U.S.C. § 1006). At trial, the court dismissed Count Seventeen on a motion by the government's attorney, who admitted that the evidence would not support a finding of guilt beyond a reasonable doubt on the charge of making false statements.

of land owned by Matthew Dial and Lawrence Lipscomb. On one occasion, Payne indicated that Daugherty would have to pay only $1,000 out of the purchase price for the 60 acres; the balance would be paid in part by the FLBAR, which would receive a first mortgage, and in part by Lloyd Taylor, who would receive a second mortgage.

On August 20, 1979, Lloyd Taylor paid Dial and Lipscomb $100 for an option to purchase the 60 acres for $102,000. On August 24, Daugherty executed an offer to purchase the 60 acres from Lloyd Taylor for $132,000 and made a $1,000 down payment on the purchase price. On October 18, 1979, Dial and Lipscomb conveyed the 60 acres directly to Daugherty. On October 19, Daugherty obtained a $110,000 loan from the FLBAR and paid $104,125 out of the loan proceeds to Dale Taylor. Daugherty also executed a second mortgage to Dale Taylor for $27,000. Lloyd Taylor served as the loan closing attorney for Daugherty.

In December, 1979, Payne told Daugherty, who also held an earlier FLBAR loan, that his two outstanding FLBAR loans would have to be consolidated. On January 14, 1980, Daugherty obtained an FLBAR loan for $250,000. Out of the proceeds remaining after the two outstanding FLBAR loans were paid off, $27,500 was paid to Dale Taylor. Lloyd Taylor again served as the loan closing attorney for Daugherty.

The $27,500 paid to Dale Taylor by Daugherty on January 14, 1980, was deposited in the trust account of Lloyd Taylor's law firm and credited to Dale Taylor. On January 15, Lloyd Taylor wrote two checks from the trust account to Dale Taylor. Lloyd Taylor deposited the two checks, totalling $14,000, in the partnership account of T & T Farms. Lloyd Taylor also wrote a $5,000 check, payable to cash, from the trust account. On January 17 and January 24, Lloyd Taylor wrote checks of $5,000 and $3,000, payable to cash, from the trust account. Lloyd Taylor cashed the three checks made payable to cash, all of which

were debited to Dale Taylor on the trust account ledger card.

These transactions formed the basis for Counts Ten and Eleven (charging Lloyd Taylor and Payne with misapplication of Federal Land Bank funds in violation of 18 U.S.C. § 657) and Count Twelve (charging Lloyd Taylor and Payne with unlawful participation in the proceeds of a Federal Land Bank loan, or aiding and abetting the same, in violation of 18 U.S.C. §§ 1006 and 2). In addition, five of the twenty-five overt acts listed in Count One were related to these transactions. Lloyd Taylor and Payne both were convicted on Counts Ten, Eleven, and Twelve.

### (3) The Creamer-Dale Taylor-Styron Transactions

On January 3, 1980, Lloyd Taylor executed an option to purchase 318 acres of land from Howard Creamer for $450,000. Subsequently, Payne contacted Herman Styron, a local farmer, and informed him that the "Creamer property" was for sale. Styron then met with Lloyd Taylor and Payne. Payne told Styron that, if Styron was unable to make his first loan payment, the FLBAR would reamortize the loan; furthermore, if Styron was unable to make his second loan payment, Payne would purchase the property. On or about January 8, Styron executed a contract to purchase the 318 acres from Lloyd Taylor for $534,240.

On February 29, 1980, Creamer conveyed the 318 acres directly to Styron. Styron financed his purchase, in part, with the proceeds of a $444,000 loan from the FLBAR. Out of the loan proceeds, $400,000 was paid to Creamer and $15,000 was paid to Dale Taylor. In addition, Styron executed a second mortgage for $50,000 and a third mortgage for $69,240, both to Dale Taylor. Dale Taylor assigned the second mortgage to Creamer. Lloyd Taylor served as the loan closing attorney for Styron.

The $15,000 paid to Dale Taylor by Styron on February 29, 1980, was deposited in the trust account of Lloyd Taylor's law

firm and credited to Dale Taylor. On March 4, Lloyd Taylor wrote two $5,000 checks, one to Dale Taylor and the other payable to cash, from the trust account. On March 6, Lloyd Taylor wrote a $2,000 check, payable to cash, from the trust account. On March 26, Lloyd Taylor wrote a $3,400 check to Dale Taylor from the trust account. The two checks to Dale Taylor were deposited in the partnership account of T & T Farms. Lloyd Taylor cashed the two checks made payable to cash, both of which were debited to Dale Taylor on the trust account ledger card.

These transactions formed the basis for Count Thirteen (charging Lloyd Taylor and Payne with misapplication of Federal Land Bank funds in violation of 18 U.S.C. § 657) and Count Fourteen (charging Lloyd Taylor and Payne with unlawful participation in the proceeds of a Federal Land Bank loan, or aiding and abetting the same, in violation of 18 U.S.C. §§ 1006 and 2).[7] In addition, four of the twenty-five overt acts listed in Count One were related to these transactions. Lloyd Taylor and Payne both were convicted on Counts Thirteen and Fourteen.

#### (4) *The Clarke Estate-Gulledge-Schoen Transactions*

In January, 1977, Robert Gulledge, the president of the Baldwin National Bank in Baldwin County, Alabama, and a friend of Payne's, submitted a bid of $735 per acre on a 320-acre tract of land owned by the Clarke Estate. The bid was accepted and, on March 8, 1977, Gulledge completed the purchase of the 320 acres for $235,200. Gulledge financed his purchase with the proceeds of a $250,000 loan from the FLBAR. Lloyd Taylor served as the loan closing attorney for Gulledge.

In May, 1978, Otto Schoen talked with Gulledge about purchasing the 320 acres. Gulledge set a price of $1,500 per acre. On January 3, 1979, Schoen closed an FLBAR loan for $650,000. The proceeds of the loan were used, in part, to purchase the 320 acres from Gulledge for $480,000. Lloyd Taylor served as the loan closing attorney for Schoen.

It was later revealed that Payne had been, at all relevant times, a 50% partner with Gulledge in the 320 acres. In March, 1978, Payne paid half of the $22,732.73 annual mortgage payment on the 320 acres. In late 1978, Payne and Gulledge signed a document acknowledging that each owned a 50% interest in the 320 acres. The document was backdated to March 8, 1977. Finally, on January 4, 1979, Gulledge paid Payne $113,646.57, representing half of the profit realized on the sale of the 320 acres to Schoen.

These transactions formed the basis for Count Two (charging Payne and Gulledge with unlawful participation in the proceeds of a Federal Land Bank loan, or aiding and abetting the same, in violation of 18 U.S.C. §§ 1006 and 2). At the conclusion of the trial, the court instructed the jury not to consider the eight overt acts related to these transactions while deliberating on Count One. Payne was convicted on Count Two, and he does not appeal that conviction.

#### (5) *The Gulf Farms-Baldwin Machine-Gulledge Transactions*

On November 17, 1979, Lloyd Taylor paid $5,000 to Gulf Farms for a 90-day option to purchase 320 acres of land for $534,000. On January 1, 1980, Lloyd Taylor created Baldwin Machine Corporation. S.D. Bowman was designated the president of Baldwin Machine, but Dale Taylor owned 90% of the corporation. On February 14, 1980, Lloyd Taylor paid $5,000 for another 90-day option on the 320 acres. On February 20, Lloyd Taylor assigned the option to Dale Taylor. On March 21, Dale Taylor assigned the option to Baldwin Machine.

---

**7.** These transactions also formed the basis for Count Fifteen (charging Payne with unlawful participation in the benefits of a Federal Land Bank mortgage release in violation of 18 U.S.C. § 1006). The jury could not reach a verdict on Count Fifteen, and the court declared a mistrial as to that count.

On March 31, 1980, S.D. Bowman (as president of Baldwin Machine) completed the purchase of the 320 acres from Gulf Farms for $534,000. Immediately thereafter, S.D. Bowman sold the 320 acres to Robert Gulledge for $768,000. Gulledge financed his purchase, in part, with the proceeds of a $570,000 loan from the FLBAR. Out of the loan proceeds, $534,000 was paid to Baldwin Machine. On the same day, Gulledge, Dale Taylor, and S.D. Bowman (as president of Baldwin Machine) executed an agreement providing that Gulledge would not have to pay the difference between the listed purchase price of $768,000 and the $534,000 payment Gulledge made from the loan proceeds. The agreement also provided that Gulledge would pay Dale Taylor two-thirds of the profits on any future lease or resale of the 320 acres, while Dale Taylor would make two-thirds of the mortgage payments on the 320 acres until such lease or resale.

These transactions did not form the basis for any substantive charges against Lloyd Taylor or Payne. Two of the twenty-five overt acts listed in Count One, however, were related to these transactions.

### B. *The Conflict of Interest Forms*

Payne was also convicted on Counts Three, Eight, and Nine, which charged him with making false statements on Conflict of Interest Forms filed annually with the Federal Land Bank (18 U.S.C. § 1006).

Count Nine concerned the 1978 Conflict of Interest Form, covering the period from April 12, 1977 to April 12, 1978, in which Payne answered "no" to the following questions:

7. Have you had a business relationship with any of the parties outlined in Section 2160(f)?

11. Are you engaged in any other business or activity (including farming operations), either in a management function or otherwise, which consumes any part of your time during normal business hours, or which might in any way whatsoever conflict with the interest of your association and/or Bank and interfere with your ability to discharge your duties?

The "no" answers to these questions were false; during the entire period covered by the Conflict of Interest Form, Payne was a 50% partner with Gulledge, who was a borrower of the FLBAR, in the ownership of the 320 acres purchased from the Clarke Estate.[8]

Count Three concerned the 1979 Conflict of Interest Form, covering the period from April 12, 1978 to January 17, 1979, in which Payne answered "no" to the following questions:

1. Have you participated in the deliberations upon any question affecting your interest or those of any person related to you or of a business organization in which you are interested?

2. Have you accepted any salary, fee, commission, honorarium, gift or favor from any of the parties outlined in 2160(c)(1)?

3. Have you entered into any of the transactions outlined in Section 2160(c)(2), wherein the consideration exceeded $1,000.00?

6. Have you participated in a transaction involving the purchase or sale of stocks, bonds, real estate, etc., for purely speculative purposes, which might tend to interfere with the proper and impartial performance of your duties or bring discredit upon an association or the Bank?

---

**8.** Section 2160(f) of the Farm Credit Administration regulations provided in pertinent part:
A salaried officer, employee, or agent of any institution of the Farm Credit System:
(f) shall not have a business relation, directly or indirectly,

(1) with a "borrower" . . . of the Farm Credit institution which is his employer; . . . .
12 C.F.R. § 612.2160(f) (1980), codified in its current form at 12 C.F.R. § 612.-2150(c)(1)(1984).

10. Have you received any consideration from the sale or transfer of any real estate acquired for resale?

The "no" answers to these questions were false; during the period covered by the Conflict of Interest Form, Payne was a 50% partner with Gulledge in the sale of the 320 acres to Schoen. In addition, Payne received $113,646.57 out of the proceeds of the FLBAR loan that was used by Schoen to purchase the 320 acres.

Count Eight concerned the 1980 Conflict of Interest Form, covering the period from January 17, 1979 to February 19, 1980, in which Payne answered "no" to the same Questions 7 and 11 that appeared on the 1978 Conflict of Interest Form. The "no" answers to these questions were false; during the period covered by the Conflict of Interest Form, Payne was a partner with Thead, who was a borrower of the FLBAR, in a farming operation. Furthermore, Payne was a partner with Daugherty, who was a borrower of the FLBAR, in a used car business.

### C. *The Conspiracy Charge*

In Count One, Lloyd Taylor, Payne, and Gulledge were charged with conspiracy to commit the following offenses, either as principals or as aiders and abettors: (1) unlawful participation in the proceeds or benefits of Federal Land Bank loans and other transactions (18 U.S.C. §§ 1006 and 2); (2) making false statements on Federal Land Bank forms (18 U.S.C. §§ 1006 and 2); (3) making false statements to influence the approval of Federal Land Bank loans and mortgage releases (18 U.S.C. §§ 1014 and 2); (4) falsifying, concealing, and making false statements to an agency or department of the United States (18 U.S.C. §§ 1001 and 2); and (5) misapplication of Federal Land Bank funds (18 U.S.C. §§ 657

and 2). Lloyd Taylor and Payne both were convicted on Count One.

### D. *The Sentences*

Lloyd Taylor and Payne each received a suspended custody sentence and five years of probation, with the special condition that each perform 350 hours of community service. In addition, each was fined a total of $50,000, with the amount of the fine to be reduced by the amount of any restitution paid to the FLBAR or the FLBNO.

## II. TAYLOR

### A. *Was Taylor "connected in any capacity with" the Bank for Purposes of 18 U.S.C. §§ 657 and 1006?*

■ Both the misapplication statute, 18 U.S.C. § 657, and the unlawful participation statute, 18 U.S.C. § 1006, under which Taylor was convicted apply to anyone who is "an officer, agent or employee of or connected in any capacity with ... any land bank [or] intermediate credit bank." Taylor contends that the two statutes are inapplicable because he was not "connected in any capacity with" the bank.[9] The government, on the other hand, contends that Taylor's dual roles as "retained counsel" for the FLBAR and "loan closing attorney" for the relevant transactions placed him squarely within the scope of the two statutes. We agree with the government, and we hold that Taylor was "connected in any capacity with" the bank for purposes of 18 U.S.C. §§ 657 and 1006.

It is undisputed that Taylor served as the "loan closing attorney" for each of the transactions relevant to the instant case. Taylor contends, however, that as "loan closing attorney" he represented the borrower and not the bank. He cites *United States v. Musgrave*, 444 F.2d 755 (5th Cir. 1971), *cert. denied*, 414 U.S. 1023, 94 S.Ct. 447, 38 L.Ed.2d 315 (1973),[10] for the propo-

---

**9.** The evidence introduced at trial established that Taylor was not an "employee" of the bank. In addition, the government apparently does not contend that Taylor was an "officer" or an "agent" of the bank.

For purposes of this opinion, "the bank" refers to the FLBAR, the FLBNO, or both.

**10.** The Eleventh Circuit, in the en banc decision *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

sition that a "loan closing attorney" is not "connected in any capacity with" the bank for purposes of 18 U.S.C. §§ 657 and 1006. We find Taylor's reliance on *Musgrave* completely misplaced. First, although the court in *Musgrave* reversed the convictions of a "loan closing attorney" under 18 U.S.C. §§ 657 and 1006, the decision turned on the sufficiency of the evidence concerning the attorney's "intent to defraud" the bank, not whether the attorney was "connected in any capacity with" the bank. *See id.* at 759–760. Furthermore, contrary to Taylor's assertion, the *Musgrave* court did not rule that a "loan closing attorney" is outside the reach of the two statutes. Rather, in discussing the "intent to defraud" issue, the court merely noted that the attorney violated no duty to the bank because "acting as a closing agent in a loan transaction does not create an agency or employer-employee relationship between the closing agent and the lending institution." *Id.* at 760. Nowhere did the *Musgrave* court state, or even imply, that a "loan closing attorney" is not "connected in any capacity with" the bank.

Finally, even if we were to conclude that *Musgrave* supported Taylor's contention, that support would be undermined by the more recent decision in *Sibley v. Federal Land Bank,* 597 F.2d 459 (5th Cir.), *cert. denied,* 444 U.S. 941, 100 S.Ct. 296, 62 L.Ed.2d 308 (1979). In *Sibley,* a civil case involving the same Federal Land Bank as the instant case, the court explained that a "loan closing attorney" represents the bank and not the borrower:

Analysis of the role played by the outside attorney who handles the loan closing indicates that the attorney's primary duty is to the Bank. By the terms of its statutory and regulatory mandate, "[t]he principal function of the Federal Land Bank is to make first mortgage loans on farm lands...." 12 C.F.R. § 600.20 (1978). It meets this function by lending only where its security is a first lien. To ascertain that its security meets this re-quirement, the Bank relies on the attorney who certifies title. This reliance on the attorney's exercise of professional judgment is the essence of the lawyer-client relationship....

The closing attorney also performs other services for the Bank besides certifying the title: title examination, recordation of the mortgage instruments, and preparation of notes, deeds, financing statements, security agreements, and loan agreements. To be sure, these services also provide a benefit to the borrower. And it is the borrower who makes the final selection of an attorney and pays for his services. Nevertheless, it is the reliance on the attorney to fulfill the Bank's legal obligation to take only first liens which distinguishes between services which otherwise benefit the bank and the borrower equally. That the Bank makes only a partial choice of its attorney does not alter that the choice belongs to the Bank. Payment for the attorney's services ... merely represents an allocation of the costs of the loan. The borrower remains free to hire an attorney to represent his own interests in processing the loan application.

*Id.* at 462–63 (footnote omitted). In light of *Sibley,* we simply cannot accept Taylor's contention that a "loan closing attorney" is not "connected in any capacity with" the bank.[11]

■ Taylor further argues, however, that his "connection" with the bank was insufficient to sustain his convictions under 18 U.S.C. §§ 657 and 1006. Taylor contends that, in order to be convicted under the two statutes, he must have had some "control" over the wrongful act that caused harm to the bank. He alleges that, in his capacities as "retained counsel" and "loan closing attorney," he had absolutely no "control" over the loan-making process. Therefore, he argues that his convictions under the two statutes should be reversed.

---

11. Because we conclude that a "loan closing attorney" is "connected in any capacity with" the bank, we need not address Taylor's arguments concerning his role as "retained attorney" for the FLBAR.

We are unpersuaded by Taylor's argument, which is essentially that we should ignore the plain meaning of the statutory language and "read into" the two statutes a "control" requirement. Although the courts in several cases have stated or implied that the defendants' "control" is a *factor* in determining whether or not the defendants were "connected in any capacity with" the bank, *see, e.g., United States v. Gregory,* 730 F.2d 692 (11th Cir.1984), *petition for cert. filed,* 53 U.S.L.W. 3291 (U.S. Sept. 26, 1984); *United States v. Dreitzler,* 577 F.2d 539 (9th Cir.1978), *cert. denied,* 440 U.S. 921, 99 S.Ct. 1246, 59 L.Ed.2d 473 (1979); *United States v. Edick,* 432 F.2d 350 (4th Cir.1970); *Garrett v. United States,* 396 F.2d 489 (5th Cir.), *cert. denied,* 393 U.S. 952, 89 S.Ct. 374, 21 L.Ed.2d 364 (1968), we have found no cases, nor has Taylor cited any, holding that "control" is a *requirement* under 18 U.S.C. §§ 657 and 1006. On the contrary, we note that the Ninth Circuit reached the opposite conclusion in the factually analogous case of *United States v. Rice,* 645 F.2d 691 (9th Cir.), *cert. denied,* 454 U.S. 862, 102 S.Ct. 318, 70 L.Ed.2d 160 (1981). In *Rice,* the defendant, a consultant for a federally insured savings and loan association, was hired to originate first mortgage loans on units of residential property. The association retained the right to approve or disapprove the loans. The defendant secured three borrowers for the association, personally charging each borrower a fee of one-and-one-half percent of the amount of the loan. The defendant was charged with and convicted of three counts of unlawful participation under 18 U.S.C. § 1006. He appealed his convictions on the grounds that, because he had no "control" over the ultimate approval or disapproval of the loans, he was not sufficiently "connected with" the association. The Ninth Circuit affirmed the convictions, stating simply:

> Because the federal government is extensively involved in the financial markets, Section 1006 was enacted not only to ensure that policy makers will not be influenced by their personal interests but also to keep federally insured lenders free from fraud.... We construe the statute broadly and hold that Rice was "connected in any capacity with" [the association].

*Id.* at 693 (citation omitted).

We agree with the Ninth Circuit in *Rice* that the statutory phrase, "connected in any capacity with," should be broadly construed in order best to effectuate the Congressional purpose of keeping federal banks and federally insured lenders free from fraud. We therefore hold that Taylor was sufficiently "connected with" the bank for purposes of 18 U.S.C. §§ 657 and 1006.

### B. *Was the Evidence Sufficient to Convict Taylor of Misapplication?*

Taylor contends that the government failed to produce evidence sufficient to convict him of misapplication under 18 U.S.C. § 657. The four elements of the crime of misapplication are: (1) the accused must have the required connection with the bank; (2) the bank must have the federal nexus specified in the particular statute; (3) the accused must have willfully misapplied funds belonging to the bank; and (4) the accused must have acted with an intent to injure or defraud the bank. *See United States v. Christo,* 614 F.2d 486, 490 (5th Cir.1980); *United States v. Farrell,* 609 F.2d 816, 818 (5th Cir.1980); *United States v. Southers,* 583 F.2d 1302, 1305 n. 3 (5th Cir.1978); *United States v. Mann,* 517 F.2d 259, 267 (5th Cir.1975), *cert. denied,* 423 U.S. 1087, 96 S.Ct. 878, 47 L.Ed.2d 97 (1976); *Garrett v. United States,* 396 F.2d 489, 491 (5th Cir.), *cert. denied,* 393 U.S. 952, 89 S.Ct. 374, 21 L.Ed.2d 364 (1968). Taylor's challenge to the sufficiency of the evidence relates to both the "willfully misapplied" and "intent to defraud" elements of the crime of misapplication.[12] We must

---

**12.** Because of our resolution of this issue, we defer momentarily our discussion of Taylor's

sustain Taylor's convictions if, taking the view most favorable to the government, a reasonable jury could have found that the evidence established guilt beyond a reasonable doubt. *United States v. Bell,* 678 F.2d 547, 549 (5th Cir. Unit B 1982) (*en banc*), *aff'd on other grounds,* 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983).[13]

■ We note initially that the term "willfully misapplied" has no simple definition. Courts have generally stated that a defendant "willfully misapplies" bank funds by converting them to the use, benefit, or gain of the defendant or a third party. *United States v. Britton,* 107 U.S. 655, 666–67, 2 S.Ct. 512, 522, 27 L.Ed. 520 (1882); *Christo,* 614 F.2d at 490; *United States v. Wilson,* 500 F.2d 715, 720 (5th Cir.1974), *cert. denied,* 420 U.S. 977, 95 S.Ct. 1403, 43 L.Ed.2d 658 (1975). The cases reveal, however, that "the methods used by bank officials to misapply the funds entrusted to them are limited only by their knowledge of banking procedures and a vigorous imagination." O'Malley, *The Federal Criminal Liability of Bank Personnel Under the Misapplication Statute,* 99 Banking L.J. 100, 106 (1982). Nevertheless, after examining the record in this case, we find that the evidence was insufficient to allow a reasonable jury to conclude, beyond a reasonable doubt, that Taylor "willfully misapplied" bank funds.

The original gravamen of the government's misapplication case against both Taylor and Payne, and the theory presented in the government's opening argument at trial, was that the two men were instrumental in arranging loans that should not have been made because the borrowers were not credit-worthy and the loans were undersecured. The government sought to prove that the financial reports filed with the bank in connection with the loan applications contained false income projections that had been supplied by Payne, that the appraised values of the land used to secure

the loans were falsely inflated by Payne, and that Taylor and Payne initially persuaded the borrowers to apply for the loans and later persuaded them not to back out of closing the loans. These allegations, if adequately proven, might have constituted "willful misapplication" of bank funds. *See, e.g., United States v. Riebold,* 557 F.2d 697 (10th Cir.), *cert. denied,* 434 U.S. 860, 98 S.Ct. 186, 54 L.Ed.2d 133 (1977); *United States v. Schmidt,* 471 F.2d 385 (3d Cir.1972). The record indicates, however, that the government fell far short of proving these allegations.

The government's sole witness with respect to the income projections, David Howse, the current president of the FLBAR, testified on direct examination that Payne's projections for the first loan made to Thead were not "reasonable." However, Howse substantially recanted this testimony on cross-examination and again on redirect examination. He admitted that minor variations in predicted crop yields and predicted livestock amounts would result in major variations in the income projections, and he further admitted that he could not characterize Payne's estimates on these matters as "outside the realm of reason." After Howse completed his testimony, the government moved to dismiss Count Seventeen, which charged Payne with violating a false statement statute by falsifying the income projection on the first Thead loan, for lack of sufficient evidence. The court granted the government's motion to dismiss. Howse was not called upon to testify again for the remainder of the trial.

The government did introduce evidence tending to prove that, with respect to three of the five relevant loans, the statements of available cash in the financial reports may have been inflated. However, the amounts of cash involved were small, amounting in each instance to less than five percent of the total assets listed in the

"intent to defraud" claim. *See infra* section II. C.

**13.** Decisions of the former Fifth Circuit, Unit B, rendered after September 30, 1981, are binding precedent in this circuit. *Stein v. Reynolds Securities, Inc.,* 667 F.2d 33, 34 (11th Cir.1982).

reports. Furthermore, the government introduced no evidence that the discrepancies in the statements of available cash would have been material to the decision whether or not to approve the loans.

The government encountered similar difficulties in presenting evidence about the land values. During its case-in-chief, the government called James Hickman, a field representative and appraiser with the FLBAR who had prepared and signed the appraisals in connection with all five of the relevant loans. Hickman testified on direct examination that Payne had "suggested" a value for each of the properties used as security for the respective loans. In each case, Hickman eventually appraised the land at the value that had been "suggested" by Payne. However, Hickman never testified that the "suggested" values were inflated or erroneous in any way. In fact, when Payne's attorney attempted to cross-examine Hickman about his opinion of the actual values of the properties, the court restricted the cross-examination because Hickman had not given "any testimony relative to the value of this property" on direct examination.

Later, as part of its rebuttal case, the government called Kermit Anderson, a senior credit analyst and appraiser with the FLBNO, and attempted to solicit testimony from Anderson about the actual value of a particular parcel of land. The court refused to permit such testimony on rebuttal

because the government's case-in-chief did not include any evidence that the original appraisals made by Hickman, based on the values "suggested" by Payne, were in any way inconsistent with the "fair and reasonable market values" of the properties.

Simply stated, the record in this case does not support the conclusion that the five relevant loans should not have been made. For all that appears in the record, the borrowers may have been perfectly acceptable candidates for the loans at the time the loans were approved and made.[14] In light of this fact, whether or not Taylor encouraged the borrowers to take out the loans is of no import. Furthermore, the record does not establish that the loans were undersecured. Although the properties were appraised at values greatly exceeding the prices paid by Taylor to acquire them, such a discrepancy, standing alone, does not establish that the appraisals were inflated. In our opinion, it is at least equally likely that the prices paid by Taylor were unrealistically low, either because the sales were distressed or because Taylor took advantage of the sellers. Because the government failed to prove either that the borrowers were not credit-worthy or that the loans were undersecured, we hold that the evidence was insufficient to establish that Taylor misapplied bank funds simply by helping to arrange the five relevant loans.[15]

---

14. The government's argument that the borrowers were not credit-worthy seems to be based primarily on the *post hoc* observation that the borrowers eventually ended up in default. However, the use of hindsight is inappropriate in determining whether or not the making of a loan constitutes misapplication of bank funds.

15. We also find the evidence insufficient to establish that Taylor misapplied bank funds under any other theory of misapplication. For example, the government failed to prove that the borrowers were not obligated to pay back the loans. *See, e.g., United States v. King,* 484 F.2d 924 (10th Cir.1973), *cert. denied,* 416 U.S. 904, 94 S.Ct. 1607, 40 L.Ed.2d 108 (1974); *United States v. Moraites,* 456 F.2d 435 (3d Cir.), *cert. denied,* 409 U.S. 891, 93 S.Ct. 109, 34 L.Ed.2d 148 (1972). The government argues on appeal that, even if the borrowers were credit-worthy

and obligated to pay back the loans, Taylor could still be found guilty of misapplication. *See, e.g., United States v. Krepps,* 605 F.2d 101 (3d Cir.1979); *United States v. Kennedy,* 564 F.2d 1329 (9th Cir.1977), *cert. denied,* 435 U.S. 944, 98 S.Ct. 1526, 55 L.Ed.2d 541 (1978). *But see United States v. Gens,* 493 F.2d 216 (1st Cir.1974). All of the cases cited by the government, however, involved loans obtained through applications filed by "straw man" borrowers because the real borrowers could not have secured loans directly from the bank. Here, on the other hand, the named borrowers used the loan proceeds themselves to purchase the respective properties from Taylor. Because this case does not involve "straw man" borrowers, the cases cited by the government are inapposite.

Finally, the government introduced no evidence that the amounts of the loans were greater than the prices paid by the borrowers for the

We do not condone Taylor's conduct in connection with the transactions involved in this case. Taylor may be guilty of defrauding the purchasers of the properties, and at the very least engaged in unethical self-dealing. But misapplication involves a crime against the *bank*, not against the bank's customers. In our opinion, the record does not support the conclusion that Taylor "willfully misapplied" bank funds within the meaning of 18 U.S.C. § 657. Because the evidence was insufficient to allow a reasonable jury to conclude beyond a reasonable doubt that Taylor was guilty of misapplication, we must reverse Taylor's misapplication convictions.[16]

### C. *Was the Evidence Sufficient to Convict Taylor of Unlawful Participation?*

Taylor also contends that the government failed to produce evidence sufficient to convict him of unlawful participation under 18 U.S.C. § 1006. More specifically, Taylor contends that the evidence failed to establish (1) that he "participate[d] or share[d] in or receive[d] directly or indirectly" any part of the proceeds of the relevant loans and (2) that he had the requisite "intent to defraud" the bank.

█ The evidence introduced at trial indicated that, shortly after the proceeds of each of the relevant loans were disbursed to Dale Taylor and placed in either the trust account of Lloyd Taylor's law firm or the partnership account of T & T Farms, Lloyd Taylor wrote and cashed several large checks made payable to cash from the same accounts. The evidence also indicated that the practice of writing large checks to cash from those two accounts

was at least unusual, if not unprecedented. Although both Dale and Lloyd Taylor testified that the cash was turned over to Dale Taylor, the jury was entitled to discount such testimony. We find that a reasonable jury could have concluded beyond a reasonable doubt that Lloyd Taylor "participate[d] or share[d] in or receive[d] directly or indirectly" a portion of the proceeds of the relevant loans.

With respect to the "intent" element, the evidence indicated that most, if not all, of the negotiations preceding each of the relevant transactions were conducted by Lloyd Taylor. In all but one instance, Lloyd Taylor personally acquired the rights to purchase the subject properties. Sometime prior to the closings, Lloyd Taylor assigned his rights in the subject properties to Dale Taylor. We find that a reasonable jury could have inferred, from the manner in which the subject properties were acquired, that it was Lloyd Taylor who was "pulling the strings," and that Lloyd Taylor used his brother to conceal his own personal involvement in the relevant transactions. Based on this inference and the aforementioned evidence concerning the proceeds of the relevant loans, we find that a reasonable jury could have concluded beyond a reasonable doubt that Lloyd Taylor had the requisite "intent to defraud" the bank. We therefore hold that the evidence introduced at trial was sufficient to establish all of the elements of the crime of unlawful participation under 18 U.S.C. § 1006.

### D. *Was the Evidence Sufficient to Convict Taylor of Conspiracy?*

█ Taylor contends that the government failed to produce evidence sufficient

---

respective properties. This case is therefore distinguishable from *United States v. Farrell,* 609 F.2d 816 (5th Cir.1980). In *Farrell,* the defendant, an employee of a state bank, was convicted on three counts of misapplication. The defendant sold three cars and, at the same time, arranged for the bank to make loans to the purchasers of the cars. Without the knowledge or approval of the purchasers, the defendant arranged for loans in amounts greatly exceeding the purchase prices of the cars, and the defendant and an accomplice divided up the excess proceeds of the loans. The court held the evidence sufficient to establish that the defendant

"willfully misapplied" bank funds. Here, on the other hand, the record contains no evidence that the amounts of the loans were greater than necessary to achieve the legitimate purposes of the loans, namely, the purchases of the respective properties.

**16.** Taylor's fifth and sixth arguments on appeal, concerning his right of cross-examination and his right to a complete trial transcript, relate solely to the validity of his misapplication convictions. Because we reverse Taylor's misapplication convictions on another ground, we do not address these arguments.

to convict him of conspiracy in violation of 18 U.S.C. § 371. Taylor admits that he committed several of the overt acts alleged in the indictment, but he argues that none of the overt acts he committed were illegal. In addition, Taylor admits that his acts furthered several of the purposes of the conspiracy alleged in the indictment, but he argues that none of the purposes he furthered were illegal. Taylor contends that he had no knowledge of, and committed no acts in furtherance of, any illegal purposes of the conspiracy alleged in the indictment. These contentions are meritless. First, "it is well settled that acts which are themselves legal lose their legal character when they become constituent elements of an unlawful scheme." *United States v. Hajecate*, 683 F.2d 894, 896–97 (5th Cir.1982), *cert. denied*, 461 U.S. 927, 103 S.Ct. 2086, 77 L.Ed.2d 298 (1983) (quoting *Continental Ore Co. v. Union Carbide Corp.*, 370 U.S. 690, 709, 82 S.Ct. 1404, 1415, 8 L.Ed.2d 777 (1962)). In addition, the government need not prove that a defendant had knowledge of all details or phases of a conspiracy. Rather, it is enough that the defendant knew the essential nature of the conspiracy. *Blumenthal v. United States*, 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947); *United States v. James*, 528 F.2d 999, 1011 (5th Cir.), *cert. denied*, 429 U.S. 959, 97 S.Ct. 382, 50 L.Ed.2d 326 (1976). Finally, we note that the government need not prove an express agreement between the alleged conspirators to violate the law. Rather, the common purpose may be inferred from the circumstances. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *James*, 528 F.2d at 1011.

In this case, the evidence introduced at trial showed that Payne referred potential sellers and purchasers of land to Taylor, that Payne persuaded potential sellers and purchasers to deal with Taylor, and that Taylor and Payne were both present when the relevant transactions were consummated. We find that a reasonable jury could have concluded beyond a reasonable doubt, based on inferences drawn from the circumstances, that Taylor conspired with Payne and that Taylor knew the essential nature of the conspiracy. We hold that the evidence was sufficient to convict Taylor of conspiracy to violate various false statement and unlawful participation statutes as alleged in the indictment.[17]

**E.** *Did the Trial Court Abuse Its Discretion by Refusing to Grant a Severance?*

Taylor contends that the trial court abused its discretion by refusing to grant a severance so that the defendants could be tried separately. Taylor's contention is based primarily on the fact that the conspiracy involved several complicated real estate transactions, some of which did not include all of the defendants. However, "[t]he mere fact that the conspiracy involved multitudinous and complex transactions is no reason for this court to reverse the denial of the motion to sever ...." *United States v. Wayman*, 510 F.2d 1020, 1024 (5th Cir.), *cert. denied*, 423 U.S. 846, 96 S.Ct. 84, 46 L.Ed.2d 67 (1975). The discretion of a trial court in refusing to grant a severance will not be reversed on appeal unless the defendants can show actual and compelling prejudice, outweighing the interests of judicial economy. *United States v. Wolford*, 614 F.2d 516, 518 (5th Cir.1980).

Here, Taylor identifies no particular evidence the introduction of which could be said to have prejudiced him. Furthermore, the record indicates that the trial court frequently cautioned the jury about evidence that might have been inadmissible against some of the defendants. *See United States v. Morrow*, 537 F.2d 120, 136 (5th Cir.1976), *cert. denied*, 430 U.S. 956, 97

---

17. Our reversal of Taylor's misapplication convictions does not affect the validity of his conspiracy conviction. Where an indictment alleges a conspiracy to commit several offenses against the United States, the charge is sustained by adequate pleadings and proof of conspiracy to commit any one of the offenses. *United States v. Solomon*, 686 F.2d 863, 875 (11th Cir. 1982); *James*, 528 F.2d at 1014.

S.Ct. 1602, 51 L.Ed.2d 806 (1977) ("The remedy of severance is justified only if the prejudice flowing from a joint trial is clearly beyond the curative powers of a cautionary instruction."). Finally, the jury failed to convict Payne and Gulledge, Taylor's codefendants, on several of the counts in the indictment, indicating that the jury was able to give each of the defendants individual consideration. We find that Taylor has not shown "actual and compelling prejudice," and therefore is not entitled to a reversal of his convictions on the basis of the trial court's refusal to grant a severance.

## III. PAYNE

### A. Was the Evidence Sufficient to Convict Payne of Misapplication?

Payne, like Taylor, contends that the government failed to produce evidence sufficient to convict him of misapplication under 18 U.S.C. § 657. We have already discussed at length Taylor's sufficiency of the evidence claim, and our prior discussion also is applicable here. We simply do not believe that the government adequately established that Payne "willfully misapplied" bank funds by approving loans that should not have been made.

In addition, we find that the government failed in its attempt to produce sufficient evidence to establish that Payne received "kickbacks," either from the borrowers or from Taylor, for his role in approving the five relevant loans. See, e.g., United States v. Tokoph, 514 F.2d 597 (10th Cir. 1975). The only evidence introduced by the government on this issue consisted of bank records indicating that Payne made two large cash deposits in bank accounts he controlled, one for $3,000 and the other for $10,000, shortly after the two Thead loan closings. We conclude that the bank records, standing alone, were insufficient to allow a reasonable jury to conclude beyond a reasonable doubt that Payne received "kickbacks" for his role in approving the loans.

Payne's conduct, like Taylor's, was certainly unethical and probably fraudulent.

Nevertheless, we find the evidence insufficient to support the conclusion that Payne "willfully misapplied" bank funds within the meaning of 18 U.S.C. § 657. We therefore must reverse Payne's misapplication convictions.

### B. Was the Evidence Sufficient to Convict Payne of Aiding and Abetting the Unlawful Participation of Taylor?

Payne contends that the government failed to produce evidence sufficient to convict him of aiding and abetting the unlawful participation of Taylor under 18 U.S.C. §§ 1006 and 2. To convict a defendant of aiding and abetting, the government need not show that the defendant "participated in every phase of the criminal venture." United States v. Hewitt, 663 F.2d 1381, 1385 (11th Cir.1981); United States v. Diecidue, 603 F.2d 535, 557 (5th Cir.1979), cert. denied, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 781 (1980). Rather, the government must show that the defendant "was associated with the criminal venture, participated in it as something he wished to bring about, and sought by his action to make it succeed." Hewitt, 663 F.2d at 1385; United States v. Martinez, 555 F.2d 1269, 1272 (5th Cir.1977). To prove association, the evidence must show that the defendant shared the criminal intent of the principal. To prove participation, the evidence must show that the defendant committed an overt act designed to aid in the success of the venture. Hewitt, 663 F.2d at 1385; United States v. Longoria, 569 F.2d 422, 425 (5th Cir.1978). Finally, we note that a defendant need not have a financial stake in a criminal venture to be convicted of aiding and abetting. Hewitt, 663 F.2d at 1385; United States v. Harris, 441 F.2d 1333, 1336 (10th Cir.1971).

In this case, the evidence introduced at trial showed that Payne referred potential sellers and purchasers of land to Taylor, that Payne persuaded potential sellers and purchasers to deal with Taylor, and that Payne arranged the approval of the relevant loans by the bank. All of these

constituted overt acts designed to aid in the success of Taylor's scheme. With respect to intent, Payne was certainly aware that, in all but one instance, Taylor personally acquired the rights to purchase the subject properties and then assigned those rights to his brother. Furthermore, the evidence showed that Payne had been instructed, on more than one occasion, about the "conflict of interest" rules of the bank.[18] We find that a reasonable jury could have concluded beyond a reasonable doubt, based on inferences drawn from the evidence, that Payne knew that Taylor's participation in the proceeds of the loans was improper but nevertheless intentionally assisted Taylor in the completion of the loans. We therefore hold that the evidence was sufficient to find Payne guilty of aiding and abetting the unlawful participation of Taylor under 18 U.S.C. §§ 1006 and 2.

C. *Does the "Exculpatory No" Doctrine Require the Reversal of Payne's False Statement Convictions?*

Payne contends that his false negative answers to certain questions on Federal Land Bank forms, which gave rise to his false statement convictions under 18 U.S.C. § 1006, were mere exculpatory denials of wrongdoing. Payne therefore contends that the so-called "exculpatory no" doctrine requires the reversal of his false statement convictions. This contention presents two distinct questions. The first question, previously unanswered in this circuit, is whether the "exculpatory no" doctrine is applicable to prosecutions under 18 U.S.C. § 1006. If so, the second question is whether the "exculpatory no" doctrine requires the reversal of Payne's false statement convictions. We hold that the "exculpatory no" doctrine is applicable to prosecutions under 18 U.S.C. § 1006, but that the doctrine does not require the reversal of Payne's false statement convictions.

The "exculpatory no" doctrine developed as an exception to 18 U.S.C. § 1001,[19] a broad false statement statute designed to prevent persons from fraudulently asserting claims against, obtaining privileges or employment from, or perverting the legitimate functions of, the government or any of its agencies.[20] The "exculpatory no" doctrine, as formulated by this circuit's predecessor, excluded from the coverage of 18 U.S.C. § 1001 "mere negative responses to questions propounded ... by an investigating agent during a question and answer conference, not initiated by the [defendant]." *Paternostro v. United States,* 311 F.2d 298, 305 (5th Cir.1962). The original basis for the doctrine was that such "mere negative responses" were outside the intended scope of the statutory prohibition. *Id.* Subsequently, courts began to recognize that the doctrine also derives "at least in part from latent distaste for an application of the statute that is uncomfortably close to the Fifth Amendment." *United States v. Lambert,* 501 F.2d 943, 946 n. 4 (5th Cir.1974) (*en banc*); *see United States*

---

**18.** This case is distinguishable from *Snyder v. United States,* 448 F.2d 716 (8th Cir.1971), which Payne cites in his brief on appeal. In *Snyder,* the court reversed the defendants' convictions for aiding and abetting embezzlement and misapplication by a bank president on the grounds that the evidence was insufficient to establish the defendants' criminal intent. The court emphasized, however, that the defendants "were inexperienced in business matters and were almost totally dependent on [the bank president] for advice. Their conduct might be viewed as naive and perhaps reckless but it does not appear to be criminal." *Id.* at 719. Here, on the other hand, it would be difficult to characterize a bank president and long-time bank employee like Payne as "inexperienced in business matters" or "naive."

**19.** 18 U.S.C. § 1001 provides:

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

**20.** For a detailed history of 18 U.S.C. § 1001, see *United States v. Bramblett,* 348 U.S. 503, 75 S.Ct. 504, 99 L.Ed. 594 (1955), and *United States v. Stark,* 131 F.Supp. 190 (D.Md.1955).

*v. Bush,* 503 F.2d 813, 818–19 (5th Cir. 1974).

The government contends that the "exculpatory no" doctrine is inapplicable to prosecutions under 18 U.S.C. § 1006. It argues that the doctrine was designed to limit the broad scope of 18 U.S.C. § 1001, and would be inappropriate in the context of a narrow false statement statute such as 18 U.S.C. § 1006, which applies only to persons "connected with" Federal Land Banks and other similar institutions. The government also notes that no court has previously extended the "exculpatory no" doctrine beyond 18 U.S.C. § 1001, and cites the recent case of *United States v. Hajecate,* 683 F.2d 894 (5th Cir.1982), *cert. denied,* 461 U.S. 927, 103 S.Ct. 2086, 77 L.Ed.2d 298 (1983), in which the Fifth Circuit suggested in dicta that the doctrine "is *only* a creature of section 1001." *Id.* at 901 (emphasis supplied).

We find these arguments unpersuasive because they address only the first basis for the "exculpatory no" doctrine, namely, that "mere negative responses" may be outside the intended scope of a particular false statement statute. The arguments fail to address the second, and in our opinion equally important, basis for the doctrine, namely, that false statement statutes may be applied in a manner that treads "uncomfortably close to the Fifth Amendment." It is primarily this solicitude for Fifth Amendment values that prevents us from attaching criminal liability to conduct consisting of mere exculpatory denials of wrongdoing. *See United States v. Anderez,* 661 F.2d 404, 409 (5th Cir. Unit B 1981). We emphatically reject the suggestion that the government should be allowed to coerce a person into admitting wrongdoing, on pain of prosecution under 18 U.S.C. § 1006, simply because the person is "connected with" a Federal Land Bank. In short, we simply see no basis for refusing to extend the "exculpatory no" doctrine to prosecutions under 18 U.S.C. § 1006.

In what appears to be a frontal attack on the "exculpatory no" doctrine itself, the government also argues that the Fifth Amendment does not provide a "license to lie." The government cites *Bryson v. United States,* 396 U.S. 64, 90 S.Ct. 355, 24 L.Ed.2d 264 (1969), and *United States v. Knox,* 396 U.S. 77, 90 S.Ct. 363, 24 L.Ed.2d 275 (1969), for the proposition that, when truthful answers to governmental inquiries might be incriminating, a person's lawful options under the Fifth Amendment are limited to declining to answer or answering honestly. We do not read the two cases so broadly.

In *Bryson,* the defendant argued that the unconstitutionality of a McCarthy-era statute requiring union officials to file a "non-Communist" affidavit with the NLRB rendered invalid his 1955 conviction under 18 U.S.C. § 1001 for making a false statement in his affidavit. The Supreme Court affirmed the conviction. However, the defendant's constitutional challenge was based on the Bill of Attainder Clause, the First Amendment, and the Due Process Clause, not the Fifth Amendment self-incrimination privilege, and the Court therefore had no reason or opportunity to address the self-incrimination issue.

In *Knox,* the Court reviewed the dismissal of an indictment charging a defendant with violating 18 U.S.C. § 1001 by making false statements on certain tax forms filed with the I.R.S. The defendant argued that he was "compelled" or "coerced" into making the false statements because federal law required him to file the forms, but truthful answers would have subjected him to prosecution under Texas law. The defendant based his argument on the Fifth Amendment self-incrimination privilege. The Supreme Court reversed the dismissal of the indictment. However, in the last paragraph of its opinion, the Court noted that the defendant might be able to prevail *at trial* on his claim that the false statements were made under "duress," or were not made "willfully." The Court simply held that the claim should not have been resolved at the pleading stage.

We find no indication in either the *Bryson* or the *Knox* opinions that the Supreme Court has repudiated the "exculpatory no"

doctrine. Having already rejected the government's argument that the "exculpatory no" doctrine applies only to prosecutions under 18 U.S.C. § 1001, we hold that the doctrine is applicable to prosecutions under 18 U.S.C. § 1006.

■ Although our solicitude for Fifth Amendment values requires us to extend the "exculpatory no" doctrine to prosecutions under 18 U.S.C. § 1006, however, the same considerations lead us to limit the doctrine to cases involving substantial and real hazards of self-incrimination.[21] *Cf. United States v. Apfelbaum*, 445 U.S. 115, 128, 100 S.Ct. 948, 956, 63 L.Ed.2d 250 (1980); *Marchetti v. United States*, 390 U.S. 39, 48, 88 S.Ct. 697, 702, 19 L.Ed.2d 889 (1968) ("The central standard for the [Fifth Amendment] privilege's application has been whether the claimant is confronted by substantial and 'real,' and not merely trifling or imaginary, hazards of incrimina-

tion."). In our opinion, it is only in such cases that Fifth Amendment values are implicated to the extent that the "exculpatory no" doctrine becomes applicable. *See United States v. Anderez*, 661 F.2d 404, 409 (5th Cir. Unit B 1981). We therefore hold that the "exculpatory no" doctrine requires the reversal of a false statement conviction under 18 U.S.C. § 1006 only if truthful affirmative answers would have been incriminating, or if the defendant can establish that he or she reasonably believed that truthful affirmative answers would have been incriminating. *Cf. Maness v. Meyers*, 419 U.S. 449, 461, 95 S.Ct. 584, 592, 42 L.Ed.2d 574 (1975) (Fifth Amendment protection includes evidence that an individual "reasonably believes" could be used against him in a criminal prosecution); *Hoffman v. United States*, 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951) (same).[22]

**21.** We reject the distinction, relied upon in some "exculpatory no" cases under 18 U.S.C. § 1001, between "investigative" and "administrative" governmental inquiries. *See, e.g., United States v. Hajecate*, 683 F.2d 894, 900–01 (5th Cir.1982), *cert. denied*, 461 U.S. 927, 103 S.Ct. 2086, 77 L.Ed.2d 298 (1983); *United States v. Bush*, 503 F.2d 813, 818 n. 2 (5th Cir.1974). Initially, we note that this distinction is based on the legislative intent behind 18 U.S.C. § 1001, *see Paternostro v. United States*, 311 F.2d 298 (5th Cir. 1962), and therefore is inapplicable to "exculpatory no" cases under 18 U.S.C. § 1006. Furthermore, we find the distinction unhelpful. We therefore choose to focus our attention on whether the governmental inquiries created substantial and real hazards of self-incrimination.

**22.** We note that our holding does not violate the principles of *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), and *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975). Those cases hold that the government must bear the burden of proving all of the elements of the crime with which a defendant is charged. *See Patterson v. New York*, 432 U.S. 197, 215, 97 S.Ct. 2319, 2329, 53 L.Ed.2d 281 (1977). Here, however, the proper *mens rea* element under 18 U.S.C. § 1006 is simply the defendant's "knowledge" that the statement made is false. *Cf. United States v. Adamson*, 700 F.2d 953, 965 (5th Cir. Unit B) (en banc), *cert. denied*, — U.S. —, 104 S.Ct. 116, 78 L.Ed.2d 116 (1983) (interpreting 18 U.S.C. § 1005, a nearly identical false statement statute). In our opinion, the "exculpatory no" doctrine, which does not negate the defendant's

"knowledge" but merely provides an "excuse" for making the false statement, is properly characterized as an "affirmative defense" on which the defendant must bear the burden of proof. We see no constitutional difficulty with requiring the defendant to bear the burden of proving that he knew or reasonably believed that truthful affirmative answers would have been incriminating.

We also see no conflict between our holding and the recent decision in *United States v. Palzer*, 745 F.2d 1350 (11th Cir.1984). In *Palzer*, the defendant was convicted of, *inter alia*, making a false statement in violation of 18 U.S.C. § 1001 for falsely answering "no" to a question on a Customs Form that asked whether the defendant was carrying more than $5,000 in currency. The government conceded trial error, and the defendant appealed on the grounds that the Double Jeopardy Clause barred his retrial. The defendant contended that the evidence introduced at his first trial was insufficient to sustain his false statement conviction. The court, in reviewing the sufficiency of the evidence, stated:

> *In this context*, the "exculpatory no" doctrine creates an additional element of the government's case under § 1001; the government must show that the defendant knew that it was permissible or legal to bring more than $5,000 in currency into the country before a prosecution for a defendant's false representation that he was not carrying more than $5,000 can be sustained.

*Id.* at 1355 (emphasis supplied). The court concluded that the evidence was "sufficient to meet

■ Upon reviewing the facts of this case, we conclude that the "exculpatory no" doctrine does not require the reversal of Payne's false statement convictions. Payne was convicted on the basis of several false negative entries he made in response to questions on annual Conflict of Interest Forms filed with the bank. A closer look indicates that truthful affirmative answers would not have been incriminating.

For example, Question 10 on the 1979 Form asked:

Have you received any consideration from the sale or transfer of any real estate acquired for resale?

A truthful affirmative answer to Question 10 would not have incriminated Payne, since no statute or regulation prohibits officers of Federal Land Banks from engaging in real estate transactions. At most, a truthful affirmative answer to Question 10 might have led bank officials to ask further questions about Payne's real estate transactions. In a similar vein, truthful affirmative answers to Question 11 on the 1978

the government's burden of proof on the element of Palzer's knowledge." *Id.* at 1356.

The *Palzer* court did not hold that, in all false statement cases, the government must bear the burden of proving that the defendant knew that truthful affirmative answers would not have been incriminating. Rather, the *Palzer* court expressly acknowledged that its discussion concerning the burden of proof was limited to the context of the case. A review of several former Fifth Circuit cases reveals why this is so.

In *United States v. Granda,* 565 F.2d 922 (5th Cir.1978), the defendant was convicted of knowingly and willfully transporting more than $5,000 in currency into the United States without filing the statutorily required reports, in violation of 31 U.S.C. §§ 1058 and 1101 (now codified at 31 U.S.C. §§ 5316 and 5322). The court held that the conviction could not be sustained because the defendant did not know about the reporting requirement. The court rejected the government's argument that the question on the Customs Form that asked whether the defendant was carrying more than $5,000 in currency placed the defendant on notice about the reporting requirement:

> The effect, if any, of this question is merely to cause the traveler to think that it is illegal to carry a large amount of money into the country.... Nor does the untruthful answer of the question by the defendant prove beyond a reasonable doubt that she knew she was supposed to fill out a form. An untruthful answer could very easily be prompted by the question on the form which might cause the traveler who enters the country with more than $5,000 to think that his or her possession is by itself illegal, and who therefore answers untruthfully in order to attempt to avoid being caught breaking the law.

*Id.* at 926.

In *United States v. Schnaiderman,* 568 F.2d 1208 (5th Cir.1978), the defendant was convicted of the same charges as in *Granda,* but was also convicted of making a false statement, in violation of 18 U.S.C. § 1001, for answering "no" to the question on the Customs Form. The court concluded that the "exculpatory no" doctrine required the reversal of the defendant's false statement conviction. After discussing the history of 18 U.S.C. § 1001 and the "exculpatory no" doctrine, the court added: "Our conclusion also fits the mold of possible self-incrimination at least in the minds of travelers who probably think it is illegal to bring more than $5,000 in currency into this country." *Id.* at 1213.

Finally, in *United States v. Anderez,* 661 F.2d 404 (5th Cir. Unit B 1981), the defendant was convicted of making a false statement, in violation of 18 U.S.C. § 1001, for answering "no" to the same question on the Customs Form as in *Schnaiderman.* Citing *Granda* and *Schnaiderman,* the court stated:

> In both of those cases we held that, unless the individual knows it is permissible to bring more than $5,000 into the country, a lie to customs agents to avoid expected retribution under currency laws will not lead to section 1001 punishment.... Unless customs officials disabuse travelers of the belief that bringing currency into the country is illegal, solicitude for fifth amendment values prevents us from attaching section 1001 liability to this sort of conduct.

*Id.* at 409 (citations omitted). The court held the "exculpatory no" doctrine inapplicable, however, because the government proved that the defendant had been informed, at or about the time he filled out the Customs Form, that it was not illegal simply to carry more than $5,000 in currency into the United States.

In our opinion, *Granda, Schnaiderman, Anderez,* and *Palzer* are based on the presumption that travelers, most of whom are probably unfamiliar with the statutes and regulations governing Customs inspections, will assume, upon receiving and reading the Customs Form, that it is illegal simply to carry more than $5,000 in currency into the United States. *It is because of this presumption* that the courts in these cases have placed the burden of proof on the government to show that the traveler knew that truthful affirmative answers would not have been incriminating. We do not read these cases as determinative of the burden of proof in other factual contexts.

and 1980 Forms and Questions 2 and 6 on the 1979 Form would not have been incriminating.

All of the other questions on the Conflict of Interest Forms concerned activities for which Payne could have secured approval from the bank and its board of directors. For example, Question 1 on the 1979 Form asked:

> Have you participated in the deliberations upon any question affecting your interest or those of any person related to you or of a business organization in which you are interested?

The activities mentioned in Question 1 were prohibited by a Farm Credit Administration regulation that appeared at 12 C.F.R. § 612.2160(a) (1980).[23] The regulation also provided, however:

> An act shall not be deemed enjoined by this paragraph ... if the employing institution determines that the degree of interest or relationship in question is not substantial but so trivial as to create little probability that the officer's ... impartiality of judgment and action has been affected, and such determination has been reported to the board of directors of the employing institution.

*Id.* The same reasoning applies to Question 3 on the 1979 Form, *see* 12 C.F.R. § 612.2160(c)(2)(iv) (1980), and Question 7 on the 1978 and 1980 Forms, *see* 12 C.F.R. § 612.2160(f)(6) (1980).

In addition, Payne did not establish that he reasonably believed that truthful affirmative answers would have been incriminating. If anything, the record supports the opposite conclusion. For example, on the 1979 Form, Payne gave truthful affirmative answers to two of the questions and added that he had received approval from the bank to engage in the activities mentioned in those questions. Furthermore, each of the forms filed by Payne contained the following provision:

> NOTE: If the answer to any of the above questions is "yes" and approval for engaging in the transaction involved has *not* been previously granted, then a

statement explaining the situation in detail must be attached. Likewise, if the circumstances surrounding a previously approved transaction or relationship have changed substantially, a statement explaining same must be attached.

This placed Payne on notice that he could secure retroactive approval for already-completed activities. In short, the record shows that even if Payne believed that truthful affirmative answers would have been incriminating, such a belief would not have been reasonable.

We note the similarity between this case and *United States v. Anderez,* 661 F.2d 404 (5th Cir. Unit B 1981). In *Anderez,* the defendant was charged with making a false statement under 18 U.S.C. § 1001 because, upon his entry into the United States, he gave a false negative answer to a question on a Customs Form that asked whether he was carrying more than $5,000 in currency. The jury convicted the defendant on the false statement charge, but the trial court granted the defendant's post-trial motion for acquittal. On appeal, the defendant argued, *inter alia,* that the "exculpatory no" doctrine precluded his false statement conviction. The court disagreed and reinstated the false statement conviction. The court explained that the defendant had been informed, at or about the time he made the false statement, that it was not illegal to bring more than $5,000 into the United States. Moreover, the court pointed out that, even though this information may not have been given to the defendant until *after* he had already made the false statement, he still could have avoided incriminating himself:

> Once informed that he could bring more than $5,000 into the country Anderez easily could have recanted and told the truth. He could have avoided liability by changing his answers on the original customs form.... Because Anderez chose to continue in his falsehood after being told that the act he sought to conceal

**23.** The regulation, in its current form, appears at 12 C.F.R. § 612.2150(b)(1) (1984).

was not illegal the exculpatory no doctrine is inapplicable.

*Id.* at 409 (footnote omitted).

We find the reasoning of the *Anderez* court persuasive. Payne, like Anderez, chose to "continue in his falsehood" although truthful affirmative answers would not have been incriminating, either because of the nature of the questions or because Payne could have sought approval for the activities covered by the questions. Furthermore, Payne did not establish that he reasonably believed that truthful affirmative answers would have been incriminating. We therefore hold that the "exculpatory no" doctrine does not require the reversal of Payne's false statement convictions.

D. *Were the Questions on the Conflict of Interest Forms "vague" or "ambiguous" so as to Require the Reversal of Payne's False Statement Convictions?*

■■■ Payne contends that the questions on the annual Conflict of Interest Forms were "vague and ambiguous." He therefore argues that, under the principle of lenity, his false statement convictions under 18 U.S.C. § 1006 should be reversed. We find this argument meritless. In our opinion, the only questions that could possibly be described as in any way "vague" or "ambiguous" were Question 6 on the 1979 Form and Question 11 on the 1978 and 1980 Forms. These questions, unlike the others on the Forms, required an exercise of judgment by the person answering the questions. None of Payne's false statement convictions, however, were based solely on his answers to these questions. Therefore, even were we to conclude that these questions were fatally "vague and ambiguous," we would nevertheless sustain Payne's false statement convictions. *Cf. United States v. Vicars*, 465 F.2d 720, 723 (6th Cir.1972) ("When one or more misrepresentations are made, it is not necessary that

all of them be proven in order to sustain a conviction for fraud.").

E. *Was the Evidence Sufficient to Convict Payne of Conspiracy?*

Payne contends that the government failed to produce evidence sufficient to convict him of conspiracy in violation of 18 U.S.C. § 371. We have already discussed the sufficiency of the evidence to convict Taylor of conspiracy. In light of the evidence and inferences mentioned therein, and for the same reasons, we hold that the evidence was sufficient to convict Payne of conspiracy to violate various false statement and unlawful participation statutes as alleged in the indictment.[24]

F. *Did the Trial Court Abuse Its Discretion by Refusing to Grant a Severance?*

Payne finally contends that the trial court abused its discretion by refusing to grant a severance so that the defendants could be tried separately. We have already discussed Taylor's similar contention. Payne, like Taylor, identifies no particular evidence the introduction of which could be said to have prejudiced him. In light of our previous discussion of Taylor's contention, and for the same reasons, we hold that Payne is not entitled to a reversal of his convictions on the basis of the trial court's refusal to grant a severance.

IV. CONCLUSION

Based on the foregoing discussion, we reverse the appellants' misapplication convictions, but we affirm all of their remaining convictions.

AFFIRMED IN PART and REVERSED IN PART.

RONEY, Circuit Judge, specially concurring:

Although I have a serious reservation about whether the "exculpatory no" doctrine is applicable to prosecutions under 18

---

**24.** Our reversal of Payne's misapplication convictions does not affect the validity of his conspiracy conviction. *See supra* footnote 17.

U.S.C. § 1006, I neither concur nor dissent from that portion of Judge Kravitch's opinion, since it is not necessary to the decision here. I fully concur in all of the rest of the Court's opinion.